Steven J. Cohen (SC-1289)
WACHTEL & MASYR, LLP
Attorneys for Plaintiff
110 East 59th Street
New York, NY 10022
(212) 909-9500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ARGO TURBOSERVE CORPORATION,        :   Case No. 07 CIV 8410 (RMB)

             Plaintiff,        :   **COMPLAINT**

    -against-        :   **JURY TRIAL DEMANDED**

DEAN ANGELLE AND DENISE ANGELLE,    :   ECF CASE

             Defendants.        :
------------------------------------------------------------x

    Plaintiff Argo Turboserve Corporation ("ATC"), by its attorneys, Wachtel & Masyr, LLP, as and for its Complaint against defendants Dean Angelle and Denise Angelle, alleges as follows:

### PARTIES

1.    Plaintiff ATC is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Lyndhurst, New Jersey.

2.    At all times relevant herein, defendant Dean Angelle was and is an individual residing in the State of Louisiana, and is the husband of Denise Angelle.

3.    At all times relevant herein, defendant Denise Angelle was and is an individual residing in the State of Louisiana, and is the wife of Dean Angelle.

## JURISDICTION AND VENUE

4. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1332 by virtue of the diversity of citizenship of the parties and the fact that the amount in controversy exceeds the sum of seventy five thousand dollars ($75,000), exclusive of interest and costs.

5. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because the parties have consented to venue in the Southern District of New York.

## GENERAL ALLEGATIONS

Stock Purchase Agreement

6. At all times relevant herein, ATC has been engaged in the business of providing supply chain management, distribution and consulting services to the aerospace, utility, industrial and energy industries.

7. At all times relevant herein, D&D Pipe and Rentals, Inc. ("D&D" or the "Company") was and is a corporation duly organized under the laws of the State of Louisiana, engaged in the purchase, sale, refurbishment, and storage of pipe used by the oil industry in various capacities.

8. Prior to the closing on March 2, 2006 of the transactions that ultimately resulted in this action ("Closing"), all of the issued and outstanding capital stock of D&D (the "Stock") was owned by defendants Dean and Denise Angelle (sometimes collectively referred to as the "Sellers").

9. By agreement dated as of February 1, 2006, ATC, D&D, and the Sellers entered into a Stock Purchase Agreement (the "SPA") pursuant to which ATC agreed, among other things, to purchase of all of the Stock.

10. The salient terms of the SPA were as follows:

(a) ATC agreed to pay the Sellers for the Stock the "Total Consideration" consisting of the following: (i) $2.5 million in cash at Closing; (ii) an advance of $1 million in cash at Closing as a "Working Capital Advance"; (iii) execution and delivery by D&D of a promissory note at Closing in the principal amount of $5 Million (the "Promissory Note"); (iv) an "Annual Earn-Out Payment," as defined in Section 1.6 of the SPA; and (v) other possible payments no longer relevant to this dispute (Section 1.2);

(b) the purchase price payable for the Stock was subject to adjustment based upon an analysis to be performed by D&D's certified public accountants after Closing (Section 1.5);

(c) as of the Closing, Dean Angelle was to have entered into a written employment agreement with D&D (the "Employment Agreement"), pursuant to which he was to be employed as an executive of D&D to lead the newly formed division of ATC dedicated to the business of selling and refurbishing pipe for oil and gas applications (the "Business") and receive an annual base salary of $250,000 plus benefits (Section 6.9);

(d) the Sellers' right to the Annual Earn-Out Payment -- projected to aggregate more than $20 million over the contemplated five (5) year term of the Employment Agreement -- would terminate if Dean Angelle quit;

(e) D&D -- based upon the financial commitments and borrowings made by its parent, ATC -- agreed to satisfy the obligations incurred by D&D's prior to the Closing under its line of credit with Whitney National Bank, and guaranteed by the Sellers, within 30 days of the Closing;

(f) the Sellers agreed not to voluntarily undertake any course of action which would materially interfere in any way with the rights obtained by ATC under the SPA or

was otherwise inconsistent with the satisfaction of the obligations or agreements of Sellers under the SPA (Section 8.4);

(g) the Sellers, jointly and severally, agreed to indemnify and hold ATC, D&D, and others harmless from "Losses" (as defined in Section 9.1(a)) sustained or suffered by them caused by, arising out of, or relating to, in relevant part,:

> (i) a breach of any representation or warranty made by Sellers in Article 2 of the SPA;
>
> (ii) a failure to perform any covenant made by Sellers in the SPA;
>
> (v) any act or omission pertaining in any way to D&D on or prior to the Closing; or
>
> (vi) any negligent act of or breach by D&D or Sellers with respect to the performance by such parties of services, contracts, agreements, policies or similar undertakings on or prior to the Closing.

(h) New York law governs this dispute and the parties consented to the exclusive jurisdiction of the New York courts; including this one (Section 10.10);

(i) the prevailing party in an action brought to enforce or interpret the SPA is entitled to reasonable attorneys' fees and costs (Section 10.12); and

(j) ATC and D&D have the right to offset any amounts due under any "Transaction Agreement," which, as defined under Section 2.19, includes the Note and that certain guaranty (the "Guaranty") made at the Closing by ATC of certain "Liabilities" of D&D, as defined in the Guaranty and including those under the Note.

11. As a result of the Working Capital Adjustment made pursuant to the SPA, the principal amount due under the Note was reduced, as of in or about December, 2006, to $4,261,689.

12. The defendants, jointly and severally, made numerous representations and warranties under the SPA, including, among others, the following, in relevant part:

> 2.2 <u>Financial Statements</u>. <u>Exhibit C</u> to this Agreement sets forth the unaudited balance sheets and related statements of income and retained earnings of the Company, as of January 31, 2005. . . Each of the foregoing financial statements has been and will be prepared on a consistent basis throughout the periods indicated and fairly present the financial position as of the respective dates of the balance sheets included and the results of operations for the respective periods indicated. Except as disclosed on the Disclosure Schedule, the Company has no known Material [greater than $5,000] debt, liability or obligation of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, that is not reflected in the financial statements attached as <u>Exhibit C</u>. . . .
>
> 2.3 <u>Absence of Specific Changes</u>. Except as identified on the Disclosure Schedule, since December 31, 2005, there have not been any:
>
> (a) Transactions by the Company outside the ordinary course of business as conducted on that date;
>
> (g) Sale or transfer of any asset of the Company, except in the ordinary course of business;
>
> (j) Agreement by any of the Sellers to do any of the foregoing.
>
> 2.6 <u>Accounts Receivable</u>. Sellers shall have identified on the Disclosure Schedule a complete and accurate schedule of the accounts receivable of the Company as of the Closing Date, together with an accurate aging of these accounts. These accounts receivable arose from valid transactions in the ordinary course of business. Each Seller represents that, to its best knowledge, and except as disclosed on the Disclosure Schedule, all the accounts receivable identified in such Disclosure Schedule are collectible, are not disputed, and represent valid obligations of the named account obligor. . . .
>
> * * * *
>
> 2.8 <u>Title to Assets</u>. The Company has good and marketable title to all of its assets, whether real, personal or mixed, tangible and intangible. Except as indicated on the Disclosure Schedule, the assets are free and clear of restrictions on or conditions to

transfer or assignment, and free and clear of mortgages, liens, pledges, charges, encumbrances, conditions and any restrictions.

* * * *

2.9   Customers.   Sellers have identified on the Disclosure Schedule a correct and current list of customers of the Company, together with summaries of the services provided to such customers during the Company's most recent fiscal year. The Company has no information, nor is aware of any facts, indicating that any of these customers intend to cease doing business with the Company, or materially alter the amount of business that they are presently doing with the Company.

2.23   Full Disclosure.   None of the representations and warranties made by Sellers, or made in any certificate, Disclosure Schedule, or memorandum furnished or to be furnished pursuant to this Agreement, contains or will contain any untrue statement of a material fact, or omit any statement or fact the omission of which would be misleading.

Defendants' Multiple Breaches Of
Their Representations And Warranties

13.   ATC entered into the SPA and the other Transaction Agreements based upon the assurances made by defendants that they had legitimate dealings at arms-length with customers in the Business. The SPA required defendants to disclose any deviations by defendants from ordinary business practices. ATC has come to learn that many, if not the majority of the defendants' business practices were outside the ordinary course, built on a foundation of deceit and non-sustainable for a good faith purchaser such as ATC.

14.   Contrary to the representations made by the Sellers in Sections 2.3(a), and 2.23 of the SPA, on more than one occasion prior to the Closing, defendants engaged in transactions outside the ordinary course of business wherein they made false representations to D&D's

customers concerning the quality of pipe sold and altered inspection reports purportedly prepared by International Oil Field Services PCI Services ("IOS") and Verde Technologies, Inc.

15. Contrary to the representations made in Sections 2.3(a) and 2.23 of the SPA, upon information and belief, on more than one occasion prior to the Closing, defendants engaged in transactions outside the ordinary course of business wherein Dean Angelle altered or caused the alteration of pipe inspection reports in order to misrepresent the quality of pipe sold to D&D's customers.

16. Contrary to the representations made in Sections 2.2, 2.8, 2.23, and Exhibit C of the SPA, the Sellers substantially overstated the value of D&D's inventory as of the Closing because, among other things, a significant portion of the pipe stored on D&D's premises which defendants represented as assets of D&D was actually owned by one or more of D&D's customers.

17. Contrary to the representations made in Sections 2.2, 2.8, 2.23 and Exhibit C of the SPA, the Sellers substantially misrepresented the value of D&D's inventory because much of the pipe stored on D&D's premises was marked with bands and/or stencils indicating it was of higher quality than its actual quality.

18. Contrary to the representations made in Sections 2.2, 2.8, 2.23 and Exhibit C of the SPA, the Sellers substantially misrepresented the value of inventory purchased from SME Company.

19. Contrary to the representations made in Sections 2.3(a), and 2.23 of the SPA, upon information and belief, on more than one occasion prior to the Closing, defendants engaged in transactions outside the ordinary course of business wherein they caused D&D to sell pipe owned by D&D's customers, without their consent, to other D&D customers, without their

knowledge, and disguised such sales by replacing pipe they wrongfully sold with that of an inferior quality which they marked with bands and/or stencils corresponding to the grade of pipe sold.

20. Contrary to the representations made in Sections 2.3(a), and 2.23 of the SPA, upon information and belief, on more than one occasion prior to the Closing, defendants engaged in transactions outside the ordinary course of business wherein they fraudulently misrepresented the quality of pipe sold to D&D customers by marking inferior quality pipe with bands and/or stencils indicating that it was of a higher quality than its actual quality.

21. Contrary to the representations made in Sections 2.9 and 2.23 of the SPA, Sellers deliberately hid and/or failed to disclose the existence of material disputes that D&D had with BP America Production Co. (or affiliated entities), one of its major accounts prior to the Closing.

22. If ATC had been made aware of the material disputes between D&D and BP America Production Co., which dispute defendants were required to disclose, ATC would have insisted upon material amendments to the SPA.

23. Contrary to the representations made in Sections 2.6, 2.9 and 2.23 of the SPA, upon information and belief, Sellers failed to disclose that bribes were paid to several customers in exchange for their orders, and failed to disclose that several of D&D's customers had indicated prior to the Closing that they intended to cease doing business with D&D.

24. On information and belief, defendants failed to disclose the nature of the business relationship of Dean Angelle with, among others, Fortune Operating Company, Russell Vera, PetroFortune and Bayou Sorrell, all in violation of Section 2.23 and Exhibit D of the SPA.

25. In violation of Section 2.23 of the SPA, the foregoing representations and warranties made by defendants all contained untrue statements of material fact, and omitted facts that rendered other representations and warranties misleading.

Dean Angelle's Abdication of Responsibilities as Executive
and Violation of Defendants' Obligations Not to Voluntarily
Take Actions which Materially Interfered with
Rights Obtained by ATC

26. Dean Angelle was hired under the Employment Agreement to lead the Business for ATC. Instead, he wholly failed to lead and instead alienated ATC, and customers, employees and vendors of D&D.

27. Specifically, Dean Angelle breached the Employment Agreement by, among other things; (a) failing to attend several scheduled meetings with customers and managers without adequate excuse; (b) failing to take a scheduled business trip to China to purchase pipe; (c) making himself unavailable to managers of ATC and customers of D&D; (d) frequently absenting himself from work; and (e) frequently behaving in an insubordinate and uncooperative manner toward ATC.

28. ATC frequently warned Dean Angelle about his misconduct and provided him with numerous opportunities to comply with his contractual obligations under the Employment Agreement.

29. Despite the fact that he could have realized up to $20 million over a five (5) year period had he honored his contractual commitments, Dean Angelle sent ATC a letter on April 2, 2007 informing plaintiff of his decision to voluntarily terminate the Employment Agreement.

30. Upon information and belief, Dean Agnelle had no intention of serving his five (5) year term as the executive charged with the responsibility of leading the Business, and

voluntarily forfeited defendants' rights to the Annual Earn-Out Payment because defendants were satisfied with cash consideration paid by ATC for the Stock.

Defendants' Shipments Without Billing Scheme

31. On information and belief, subsequent to the Closing, defendants formed a competing company and misappropriated proprietary information and business opportunities of D&D in violation of their obligations to ATC and D&D.

32. Subsequent to the Closing, between August and October 2006, defendants arranged for two separate sales of chrome pipe to Edge Petroleum, including a sale of 902 joints in August 2006, and 621 joints in October 2006.

33. Upon information and belief, 621 joints of chrome pipe were transferred to Edge Petroleum in or about October 2006, however there is no record that D&D paid the associated shipping charges.

34. No compensation was received by D&D for the 621 joints of chrome pipe that its records indicate were delivered to Edge Petroleum in or about October 2006.

35. On information and belief, defendants altered or destroyed D&D's records concerning the transfer of 621 joints of chrome pipe.

36. On information and belief, defendants fraudulently diverted 621 joints of chrome pipe, or the proceeds from the sale thereof, for their own benefit, in violation of their obligations to ATC and D&D.

37. Subsequent to the Closing, in or about June and July 2006, defendants arranged for sales of drill pipe to SME Company consisting of approximately 81 joints. When pressed for a subsequent explanation concerning the past due obligation of SME Company for this pipe, Dean Angelle stated that the transaction was not a true "sale" but a consignment.

38. SME Company never paid full value for the pipe, records handled by defendants concerning the transaction are incomplete, and D&D suffered losses in excess of $100,000 as a result thereof.

Other Material Interference by Defendants

39. Another example of defendants' material interference with the ability of ATC to effectively operate the Business after the Closing was with respect to a sale of pipe to D&D's customer, Michael Jordan of Fort Smith, Arkansas in November 2006. This customer rejected the pipe sold to it for failure to meet promised specifications.

40. Upon information and belief, Dean Angelle tampered with the pipe sold to Michael Jordan, or caused the pipe to be tampered with, in a manner that gave the appearance that the pipe had been independently inspected by IOS when, in fact, it had not been. He also deliberately hid from D&D the existence of this dispute for an extended period.

41. As a result of this material interference by defendant, D&D lost a customer, more than $138,000 in respect of the sale and incalculable damage to its reputation in the trade.

42. Dean Angelle's disruptive tenure as the executive of the Business for little more than a year was a material interference with the rights that ATC obtained under the SPA, and in direct violation of Section 8.4 of that agreement.

**FIRST CLAIM FOR RELIEF**
**(Indemnification)**

43. ATC repeats and re-alleges each and every allegation set forth above as though fully set forth herein.

44. As a result of the numerous misrepresentations made by defendants, ATC paid them substantially more for the Stock of D&D than its actual worth.

45. As a result of the numerous misrepresentations made by defendants, ATC has incurred, and will continue to incur, substantial Losses, including but not limited to incalculable liability and legal fees resulting from the transactions entered into by defendants outside of the ordinary course of business.

46. In accordance with Section 9.3 of the SPA, by letter dated August 14, 2007, ATC sent defendants a Notice of Indemnification advising defendants of their Losses.

47. Pursuant to Article IX of the SPA, defendants are liable to ATC for all Losses sustained, or which may be sustained, as a result of the defendants' breaches of the SPA as alleged above.

48. By reason of the foregoing, ATC has been damaged in an amount to be determined at trial, but believed to be in excess of $7 million.

## SECOND CLAIM FOR RELIEF
### (Fraudulent Inducement)

49. ATC repeats and re-alleges each and every allegation set forth above as though fully set forth herein.

50. ATC relied on the representations made by defendants when they negotiated and executed the SPA.

51. When the defendants made the representations in Article II of the SPA, set forth in detail above (the "Misrepresentations"), they knew them to be false.

52. Defendants' Misrepresentations were made in order to induce ATC to enter into the SPA.

53. Sellers' Misrepresentations render the SPA inherently unfair and fraudulent.

54. As a direct and proximate cause of Sellers' fraud, ATC has suffered damages and is entitled to rescission of the SPA, compensatory, consequential, and punitive damages in an amount to be proved at trial, but believed to be in excess of $7 million.

### THIRD CLAIM FOR RELIEF
### (Declaratory Judgment)

55. ATC repeats and re-alleges each and every allegation set forth above as though fully set forth herein.

56. As a result of the Misrepresentations made by defendants and breaches of other covenants in the SPA, the Total Consideration agreed to by ATC is substantially greater than the value of the Stock.

57. As set forth in the First Claim for Relief, pursuant to Article IX of the SPA, defendants agreed to indemnify ATC for Losses suffered or which may be sustained or suffered by ATC.

58. As a result of the Misrepresentations and breaches of other covenants in the SPA made by defendants, ATC has sustained, and will continue to sustain, substantial Losses, calculated to be greater than $7 million.

59. Subject to the offset rights under the Note, the principal amount of the Note is presently less than $4,167,884.

60. Pursuant to the Guaranty, ATC guaranteed D&D's obligations under the Note as an obligor thereunder.

61. Pursuant to paragraph 3 of the Note, and as an obligor on the Note, ATC is entitled to offset Losses it suffered and will suffer as a result of defendants' Misrepresentations and breaches of other covenants of the SPA, against any amounts due under the Note.

62. By letter dated September 5, 2007, counsel for defendants responded to ATC's Notice of Indemnification. That response included a reference to an alleged default by ATC under the Note.

63. A justifiable controversy exists with respect to the rights of offset under the Note and Guaranty by ATC.

64. By reason of the foregoing, a judgment should be entered declaring that defendants have no right to payment under the Note or Guaranty unless and until it is adjudicated that the Losses suffered by ATC are less than any amount claimed due by defendants under the Note and Guaranty.

**WHEREFORE**, it is respectfully requested that judgment be entered in favor of ATC and against defendants as follows:

(a) on the First Claim for Relief, damages in an amount to be determined at trial, but believed to be in excess of $7 million;

(b) on the Second Claim for Relief, (i) an order rescinding the SPA; (ii) damages in an amount to be determined at trial, but believed to be in excess of $7 million; and (iii) punitive damages treble to the compensatory damages awarded;

(c) on the Third Claim for Relief, a judgment declaring that defendants may not enforce or attempt to enforce the Note or Guaranty unless and until it is adjudicated that the Losses suffered by ATC are less than any amount claimed due by defendants under the Note and Guaranty;

(d) an award of reasonable attorneys fees and costs pursuant to Section 10.12 of the SPA; and

(e) such other and further relief as may be just and proper.

Dated: New York, New York
September 27, 2007

WACHTEL & MASYR, LLP

By: _____
Steven J. Cohen (SC-1289)

110 East 59th Street
New York, New York 10022
(212) 909-9500

Attorneys for Plaintiff
Argo Turboserve Corporation