*Execution Copy*

**STOCK PURCHASE AGREEMENT**

**BY AND AMONG**

**ARGO TURBOSERVE CORPORATION,
A DELAWARE CORPORATION,**

**DEAN ANGELLE and DENISE ANGELLE,**

**AND**

**D&D PIPE AND RENTALS, INC.,
A LOUISIANA CORPORATION,**

**DATED AS OF FEBRUARY 1, 2006**

1

EXHIBIT "1"

*Execution Copy*

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "*Agreement*") dated as of February 1, 2006, by and among ARGO TURBOSERVE CORPORATION, a Delaware limited liability company ("*Buyer*"), DEAN ANGELLE and DENISE ANGELLE (collectively, the "*Sellers*"), and D&D PIPE AND RENTALS, INC., a Louisiana corporation ("*Company*"). The term "*Party*" or "*Parties*" means the Buyer, Company, or Sellers, or all such parties, as the case may be.

## RECITALS

WHEREAS, the Division (as such term is defined herein) is entering into an employment agreement with Dean Angelle (the "*Employment Agreement*") and such Employment Agreement shall commence on the Closing Date (as such term is defined herein) and shall continue until the end of the Term (as such term is defined in the Employment Agreement);

WHEREAS, Sellers own and will own as of the Closing Date all of the issued and outstanding capital stock of the Company (the "*Stock*");

WHEREAS, Sellers desire to sell, and Buyer desires to purchase, the Stock on the terms and conditions hereinafter set forth; and

WHEREAS, Buyer is purchasing all of the stock of the Company following the Closing Date, the Company will be operated as a wholly-owned subsidiary of the Buyer, operated as a new, separate and distinct division of Buyer (the "*Division*"), dedicated to the business of selling and refurbishing pipe for oil and gas application and maximizing the business opportunities related to the technology and assets transferred from the Company (the "*Business*").

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and intending to be legally bound, the Parties do hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE/CLOSING

1.1     Transfer of the Stock by Sellers. Subject to the terms and conditions of this Agreement, Sellers agree to sell, assign and transfer good and valid title and interest in and to the Stock free and clear of all encumbrances to Buyer at the Closing (as defined herein). The Sellers shall deliver to Buyer an affidavit of lost stock certificates to Buyer,

in the form of Attachment F ("*Affidavit of Lost Stock Certificates*"), accompanied by a duly executed stock power in favor of Buyer.

      1.2    Total Consideration and Terms.

      (a)    The aggregate consideration for the Stock to be purchased by Buyer, subject to the Purchase Price Adjustment as provided in Section 1.5 (the "*Total Consideration*"), shall consist of: (i) Two Million Five Hundred Thousand Dollars ($2,500,000) (the "*Cash Consideration*"), (ii) an advance for One Million Dollars ($1,000,000) against an anticipated increase in working capital from the June 30, 2005 financial statements through the Closing (the "*Working Capital Advance*"), (iii) a secured note executed by the Division in favor of Sellers in the form attached hereto as Exhibit A hereto, in a principal amount equal to Five Million Dollars ($5,000,000) ("*Promissory Note*"), (iv) the Annual Earn-Out Payment (as defined herein), (v) the End of Term Earn-Out Payment (as defined herein), and (vi) the Flip Fee (as defined herein), if any.

      (b)    The Total Consideration shall be payable as follows:

      (i)    On the Closing Date, the Buyer and the Division shall pay, or cause to be paid, to Seller by wire transfer of immediately available funds: (A) the Cash Consideration and, (B) the Working Capital Advance;

      (ii)    On the Closing Date, the Company shall cause the Division to deliver to Sellers the executed Promissory Note;

      (iii)    On such dates as enumerated in, and in accordance with Section 1.6 below, the Division shall pay to Sellers an earn-out payment in an amount equal to twenty-five percent (25%) of the Excess Division Pre-Tax Net Income (as defined herein) (the "*Annual Earn-Out Payment*");

      (iv)    On such date as enumerated in, and in accordance with Section 1.7 below, the Division shall pay to Sellers an end of term payment in an amount equal to ten percent (10%) of the EBITDA Multiplier (as defined herein) (the "*End of Term Earn-Out Payment*"); and

      (v)    On such date as enumerated in, and in accordance with Section 1.8 below, the Division shall pay to Sellers a flip fee ("*Flip Fee*").

      1.3    The Closing. The closing shall take place at the offices of Boies, Schiller & Flexner, LLP, 570 Lexington Avenue, New York, New York, ("*Closing*") as soon as practicable after all conditions specified in Articles IV and V have been satisfied or waived in accordance with this Agreement, but not later than the fifth business day following the date that all conditions specified in Articles IV and V have been satisfied or waived in accordance with this Agreement, or at such other place or on such other date as Sellers and Buyer may mutually agree, and such date that the Closing occurs shall be the closing date ("*Closing Date*").

3

be unacceptable and which have been specified in writing to Sellers have been remedied to Buyer's satisfaction, and (ii) with the results of its business, technical, legal and financial review of the books, records, agreements and other legal documents and business organization of the Company.

6.3    Consents, Approvals and Waivers. Sellers, Buyer and Company shall have obtained, in a manner satisfactory to Buyer and its counsel, any and all approvals, consents, permits and waivers and made all filings necessary or appropriate for the sale and transfer of the Stock pursuant to this Agreement and to complete the related transactions as contemplated herein.

6.4    Covenants. All covenants, agreements and conditions contained in this Agreement to be performed by the Parties on or prior to the Closing Date shall have been performed or complied with in all respects.

6.5    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions shall be satisfactory in substance and form to Buyer and its counsel, and Buyer and its counsel shall have received all such counterpart originals or certified or other copies of such documents and instruments as they may reasonably request.

6.6    No Adverse Change. During the period from the date hereof until the Closing Date, there shall have been no material adverse change in the financial condition or business of the Company.

6.7    Absence of Litigation. No action, suit or proceeding before any court or government body, pertaining to the transaction contemplated by this Agreement or the Company, shall have been instituted or threatened on or before the Closing Date.

6.8    No Change In Status or Condition Of Assets. There shall have been no material change in the condition of any of the assets, whether tangible or intangible, of the Company and no proceeding with respect to any of the assets.

6.9    Employment Agreement. Dean Angelle will have entered into an employment agreement with the Division, substantially in the form attached as Exhibit E hereto.

6.10    Employee Confidentiality Agreements. All key personnel of the Company shall enter into non-compete and confidentiality agreements with the Division, in the form or forms as the Buyer may reasonably request.

6.11    Lease Agreement.    Sellers shall have entered into a Lease Agreement with Sellers' company, Angelle Properties, L.L.C., to lease the property located at 2450 S.E. Evangeline Throughway, Lafayette, Louisiana (the "*Property*") substantially in the form attached as Exhibit G.

16

Earn-Out Payment, and Flip Fee. Buyer shall furnish or cause to be furnished to Sellers and their representatives' data and information concerning the Business, finances and properties of the Division and Buyer as Sellers shall reasonably require and request.

      8.7    Indebtedness.

      (a)    Within thirty (30) days after the Closing Date, the Division shall cause to have that certain One Million Five Hundred Thousand Dollar ($1,500,000) Whitney National Bank Business Line of Credit satisfied in full. If the Division shall fail to satisfy such debt, the Division shall, in accordance with Article IX herein, indemnify and hold Sellers harmless from any liabilities directly stemming from such failure that occurs after the Closing Date. Any claims pursuant to this Section 8.6 shall not count against the Basket (as defined herein).

      (b)    On the Closing Date, the Division shall assume the Company Vehicles and the Vehicle Loans.

      8.8    Environmental Inspection and Testing. Buyer shall, at their sole cost and expense, conduct a Phase II environmental assessment of the Property which will include, but not be limited to certain of the soils, including invasive boring and testing, of the Property. If the Phase II environmental assessment of the Property recommends environmental remediation measures with respect to the Property or other equipment and facilities affecting the Property (the "*Environmental Remediation*"), Sellers shall promptly conduct the Environmental Remediation at their sole cost and expense, and such Environmental Remediation shall be promptly performed with minimal interruption to the Division's business activities at the Property. The Environmental Remediation shall be deemed complete upon the preparation and delivery to Buyer of a report by a licensed environmental engineer reasonably satisfactory to Buyer that the Property (i) is free of any hazardous materials or hazardous substances (as such terms are defined by Environmental Laws), (ii) is in a condition that meets all requirements of law, including but not limited to the State of Louisiana Department of Environmental Quality Consolidated Compliance Order & Notice of Potential Penalty dated as of February 19, 2004, and (iii) that any leakage from any equipment or facilities affecting the tested soils has been appropriately remediated (the "*Remediation Report*"). The date the Remediation Report is deemed complete shall be the "*Remediation Report Date*". If the Sellers fail to satisfy their obligations under this Section 8.8, Sellers shall, in accordance with Article IX herein, indemnify and hold Buyer's Indemnified Parties harmless from any liabilities directly stemming from such failure.

## ARTICLE IX
## INDEMNIFICATION

      9.1    Indemnification By Sellers.

      (a)    Sellers, jointly and severally, agree to indemnify and hold Buyer, the Division, and each of their employees, officers, directors, shareholders, subsidiaries, members, employees and agents and the successors, heirs and personal representatives of

any of them (collectively the "*Buyer Indemnified Parties*"), harmless from and against any damages, liabilities, losses and expenses (including, but not limited to, reasonable expenses of investigation and reasonable attorneys' fees incurred in defending any claim, including claims by any third party, amounts paid in settlement of any claim or suit, including, Taxes, fines, penalties and interest) whether absolute, accrued or contingent, known or unknown, and whether or not disclosed by Sellers in this Agreement (including the Disclosure Schedule or most recent financial statements) (collectively, "*Loss*" or "*Losses*") which may be sustained or suffered by the Buyer Indemnified Parties, caused by, arising out of, or relating to:

    (i)    a breach of any representation or warranty made by Sellers in Article 2 herein;

    (ii)    a failure to perform any covenant made by Sellers in this Agreement;

    (iii)    any product warranty or product liability claims with respect to products, materials or services produced, invoiced, sold, performed or shipped by the Company on or prior to the Closing Date;

    (iv)    any employee related matters with respect to any person employed by the Company on or prior to the Closing Date;

    (v)    any act, omission to act or occurrence (but excluding such acts, omissions to act, and occurrences that are in the ordinary course of business (including, but not limited to, accounts payable in the ordinary course of business), pertaining in any way to the Company on or prior to the Closing Date;

    (vi)    any negligent act of or breach by the Company (or any of its affiliates or predecessors or any of the respective officers, directors, agents, consultants or employees of Sellers or any of their affiliates or predecessors) with respect to the performance by such parties of services, contracts, agreements, policies or similar undertakings on or prior to the Closing Date (collectively, Section 9.1(a)(i) through (vi), "*Buyer's General Liability Claims*");

    (vii)    any Taxes pertaining to the conduct or operation of the Company on or prior to the Closing Date, including, without limitation, the transactions contemplated by this Agreement or any of the Transaction Agreements ("*Tax Claims*"); and

    (viii)    any Environmental Laws, including, without limitation, any release or threatened release of hazardous substances or hazardous materials (as such terms are defined in any Environmental Laws) occurring on or prior to before the Remediation Report Date ("*Environmental Claims*");

provided, however, that (A) no indemnification shall be payable by the Sellers with respect to any claims asserted by the Buyer Indemnified Parties after the expiration or termination date prescribed for such claims in Section 9.5 hereof, and (B) the liability of the Sellers for indemnification payable under this Section 9.1(a) shall not exceed (1) for all Tax Claims, fifty percent (50%) of the Total Consideration, (2) for all Environmental Claims, fifty percent (50%) of the Total Consideration; and (3) for all Buyer's General Liability Claims, (i) for the period commencing on the Closing Date through and including the second anniversary of the Closing Date, fifty percent (50%) of the Total Consideration, (ii) after the second (2nd) anniversary of the Closing Date through and including the third (3rd) anniversary of the Closing Date, twenty percent (20%) of the Total Consideration, and (ii) after the third (3rd) anniversary of the Closing Date through and including the fifth (5th) anniversary of the Closing Date, ten percent (10%) of the Total Consideration.

(b)        For purposes of this Agreement, *"Taxes"* means federal, state, local or foreign taxes, assessments, interest, penalties, deficiencies, fees and other governmental charges or impositions (including without limitation, all income tax, unemployment compensation, social security, payroll, sales and use, excise, privilege, property, ad valorem, franchise, license, school and any other tax or similar governmental charge or imposition).

9.2        Indemnification By The Division. The Division agrees to indemnify and hold the Sellers, the Company and its employees, officers, directors, shareholders, members, employees and agents and the successors, heirs and personal representatives of any of them (collectively, the *"Sellers' Indemnified Parties"*), harmless from and against any damages, liabilities, losses and expenses (including, but not limited to, reasonable expenses of investigation reasonable attorney's fees and reasonable expenses of investigation incurred in defending any claim, including claims by a third person, amounts paid in settlement of any claim, or suit, Taxes, fines, penalties and interest) whether absolute, accrued or contingent, known or unknown, and whether or not disclosed by Sellers in this Agreement or on the Disclosure Schedule or most recent financial statements (collectively, *"Loss"* or *"Losses"*) which may be sustained or suffered by Sellers' Indemnified Parties, caused by, arising out of, or relating to:

(i)        a breach of any representation or warranty made by Buyer in Article 3 hereof;

(ii)        a failure to perform any covenant made by Buyer in this Agreement;

(iii)        any product warranty or product liability claims with respect to products, materials or services produced, invoiced, sold, performed or shipped by the Division after the Closing Date;

(iv)        any employee related matters with respect to any person employed by the Division after the Closing Date;

21

(v)     any act, omission to act or occurrence pertaining in any way to the Division after the Closing Date;

(vi)    any negligent act of or breach by the Division (or any of its affiliates or any of the respective officers, directors, agents, consultants or employees of the Division) with respect to the performance by such parties of services, contracts, agreements, policies or similar undertakings after the Closing Date;

(vii)   any Taxes pertaining to the conduct or operation of the Division after the Closing Date, including, without limitation the transactions contemplated by this Agreement or any of the Transaction Agreements; and

(viii)  any Environmental Laws, including, without limitation, any release or threatened release of hazardous substances or hazardous materials (each as defined by any Environmental Law) occurring after the Remediation Report Date.

provided, however, that (A) no indemnification shall be payable by the Division with respect to any claims asserted by the Sellers' Indemnified Parties after the expiration or termination date prescribed for such claims in Section 9.5 hereof, and (B) the aggregate liability of the Division for indemnification payable for any and all Losses under this Section 9.2 shall not exceed fifty percent (50%) of the Total Consideration.

9.3     Notice and Defence of Claims.

(a)     In the event that any of the parties shall incur or suffer any Losses in respect of which indemnification may be sought by such Party pursuant to the provisions of this Section 9, the Party seeking to be indemnified hereunder (the "*Indemnified Party*") shall assert a claim for indemnification by written notice (a "*Notice*") to the Party from whom indemnification is sought (the "*Indemnifying Party*") stating the nature and basis of such claim. In the case of Losses arising by reason of any third party claim, the Notice shall be given within thirty (30) days of the filing or other assertion of any such claim against the Indemnified Party, but the failure of the Indemnified Party to give the Notice within such time period shall not relieve the Indemnifying Party of any liability that the Indemnifying Party may have to the Indemnified Party unless the Indemnifying Party is actually prejudiced thereby.

(b)     The Indemnified Party shall provide to the Indemnifying Party on request all information and documentation reasonably necessary to support and verify any Losses which the Indemnified Party believes give rise to a claim for indemnification hereunder and shall give the Indemnifying Party reasonable access to all premises, books, records and personnel in the possession or under the control of the Indemnified Party which would have bearing on such claim.

9.4     Exclusive Remedy.  Except in the case of fraud or as otherwise provided in this Agreement or any of the Transaction Agreements, the sole recourse and

exclusive remedy of the Buyer, the Division, and Sellers against each other for claims arising out of this Agreement, whether based on tort, contract, statutory or common law remedy or equitable remedy or otherwise, including but not limited to, any misrepresentation, breach of warranty or otherwise, shall be to assert a claim for indemnification under the indemnification provisions of this Article IX, and the Buyer , the Division, and the Seller covenant that it or they will not seek to obtain any remedy except as provided in this Article IX.

9.5     Survival.

(a)     All representations and warranties made by a Party shall survive through and including the fifth (5th) anniversary of the Closing Date, except that representations and warranties made relating to tax issues shall survive through and including the seventh (7th) anniversary of the Closing Date.

(b)     Each Party's right to assert a claim for indemnification under this Article IX shall survive through and including the fifth (5th) anniversary of the Closing Date, except that each Party's right to make an indemnification claim based on tax issues shall survive through and including the seventh (7th) anniversary of the Closing Date.

(c)     Notwithstanding anything to the contrary contained in this Agreement, if an Indemnified Party shall have delivered a Notice to the Indemnifying Party of one of more claims for indemnification pursuant to this Article 9 in accordance with Section 9.3, the limitations set forth in this Section 9.5 shall not apply to such claims until such claims, and the losses with respect thereto, are finally resolved or settled or a final arbitral award (or other judgment, if applicable) has been issued by an arbitral tribunal (or other tribunal with competent jurisdiction) with respect to such claims.

9.6     Limitations on Indemnification. For purposes of this Article IX, in calculating the dollar amount limitations on indemnification, Total Consideration shall include all amounts earned during the Term of this Agreement without regard to the date such amounts are earned. When contingent future earnings are earned, such amounts earned shall be included in the calculation of the indemnification limitation (which are based on a percentage of Total Consideration) and will retroactively apply in the calculation of Total Consideration to reimburse a Party for any indemnification claims made in a timely manner pursuant to this Article IX.

## ARTICLE X
## MISCELLANEOUS

10.1     Entire Agreement. This Agreement, including the schedules and exhibits hereto, and the Transaction Agreements, contains the entire understanding among the parties hereto and with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, representations, inducements or conditions, express or implied, oral or written, except as set forth herein. The express

23

*Execution Copy*

Dean and Denise Angelle
100 Blue Ridge Drive
Carencro, Louisiana 70520
Phone: 1-337-896-0413
Fax: 1-337-896-1930

with a copy to:

Perret Doise, APLC
600 Jefferson Street, Suite 1600
Lafayette, Louisiana 70501
Attn: Dennis Doise
Phone: 1-337-262-9000
Fax: 1-337-262-9001

Any Party may alter the addresses to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 10.5 for the giving of notice.

10.6    Incorporation of Schedules And Exhibits.  All schedules, exhibits and other documents and written information required to be delivered pursuant to this Agreement are incorporated into this Agreement by this reference and are warranted by the Party or Parties which deliver the same to be accurate and complete in all material respects.

10.7    Expenses.  Each Party will bear its respective expenses and legal fees incurred with respect to this Agreement, and the transactions contemplated hereby.

10.8    Captions.  The captions contained in this Agreement are for convenience and reference purposes only and shall not affect in any way the meaning and interpretation of this Agreement.

10.9    Severability.  If any provision of this Agreement, or the application thereof, will for any reason and to any extent be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the greatest extent possible, the economic, business and other purposes of the void or unenforceable provision.

10.10    Governing Law.    In all respects, including all matters of construction, validity and performance, this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York applicable

to contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws. Any action to enforce any of the provisions of this Agreement shall be brought in a court of the State of New York located in the Borough of Manhattan of the City of New York, or in a Federal court located within the Southern District of New York. The parties consent to the jurisdiction of such courts and to the service of process in any manner provided by New York law. Each Party irrevocably waives any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such court and any claim that such suit, action or proceeding brought in such court has been brought in an inconvenient forum and agrees that service of process in accordance with the foregoing sentences shall be deemed in every respect effective and valid personal service of process upon such Party.

10.11  Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof shall bear the signatures of all of the Parties indicated as the signatories hereto.

10.12  Attorneys' Fees. In the event that any action or proceeding is brought by any Party to enforce or interpret any provision, covenant or condition contained in this Agreement, the prevailing party in such action or proceeding (whether after trial or appeal) shall be entitled to recover from the Party not prevailing its expenses therein, including reasonable attorneys' fees and allowable costs.

10.13  Representation. This document is the result of negotiations between Parties, each of whom was represented or had the opportunity to be represented in the transaction, and has had the opportunity to have had the transactional documents reviewed by counsel of their own choice.

10.14  Right of Offset. Buyer and the Division shall have the right to offset any amounts payable under any Transaction Agreement, by any monies owed to Buyer or the Division by the Sellers. This right shall survive the expiration and termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**BUYER**
ARGO TURBOSERVE CORPORATION

By: _____

Name:    Clyde Keaton
Title:    President

**SELLERS**

By: _____

Name:    Dean Angelle

By: _____

Name:    Denise Angelle

**COMPANY**

D & D PIPE AND RENTALS, INC.

By: _____

Name:    Dean Angelle
Title:    President

STOCK PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**BUYER**
ARGO TURBOSERVE CORPORATION

By: _____
Name:    Clyde Keaton
Title:    President

**SELLERS**

By: _____
Name:    Dean Angelle

By: _____
Name:    Denise Angelle

**COMPANY**

D & D PIPE AND RENTALS, INC.

By: _____
Name:    Dean Angelle
Title:    President

STOCK PURCHASE AGREEMENT