*Execution Copy*

# EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement ("*Agreement*") is entered into by and between D&D Pipe and Rentals, a Louisiana corporation ("*Company*") and a wholly owned subsidiary and division of Argo Turboserve Corporation, a Delaware corporation, having offices at 49 Commerce Road, Carlstadt, New Jersey (the "*ATC*") and Dean Angelle, an individual currently residing at _____ ("*Executive*"), as of March 3, 2006. The term "*Party*" or "*Parties*" means the Company or Executive, or both, as the case may be.

## WITNESSETH:

WHEREAS, the Company, Executive, Denise Angelle, and ATC have entered into a stock purchase agreement pursuant to which the Company is purchasing one hundred percent (100%) of the D&D Pipe stock ("*Stock Purchase Agreement*") and such transaction shall be completed on the Closing Date (as such term is defined in the Stock Purchase Agreement);

WHEREAS, the Company desires to employ the Executive on and after the Closing Date pursuant to the terms and conditions and for the consideration set forth in this Agreement, and Executive desires to become an employee of the Company, pursuant to such terms and conditions and for such consideration.

NOW, THEREFORE, for and in consideration of the mutual promises, covenants, and obligations contained herein, the Company and the Executive hereby agree as follows:

### ARTICLE I: EMPLOYMENT, DUTIES AND REPRESENTATIONS

1.1. <u>Term of Employment</u>. Subject to the terms and conditions of this Agreement, the Company agrees to employ Executive, and Executive agrees to be employed by the Company, beginning on the Closing Date and continuing until the date that is five (5) years after the Closing Date, or until otherwise terminated earlier pursuant to the terms of this Agreement (the "*Term*"). If at the end of the Term the Parities desire to enter into negotiations for further employment, Executive shall be an at-will employee until the Parties enter into a new employment agreement.

1.2. <u>Position and Duties</u>.

(A) Beginning on the Closing Date, Executive shall be employed as an executive of the Company to lead a newly formed, separate and distinct division of the ATC dedicated to the business of selling and refurbishing pipe for oil and gas application (the "*Business*") and maximizing the business opportunities related to the technology and assets transferred under the Stock Purchase Agreement (the "*Division*"). Executive's duties include, but are not limited to, using the Executive's best efforts to: (i) transition the technology and assets purchased by ATC pursuant to the Stock Purchase Agreement to the Company and seek patents for the Company (or such other appropriate intellectual property protection) for any such technology and for any technology developed by Executive after the Closing Date; (ii) provide

EXHIBIT "2"

2.5. The Company shall not by reason of this Article 2 be obligated to institute, maintain, or refrain from changing, amending, or discontinuing, any employee benefit program or plan, so long as such actions are similarly applicable to covered employees generally.

2.6. Taxes. The Company may withhold from the Base Salary, any other compensation, benefits, or amounts payable under this Agreement all federal, state, city, or other taxes as may be required pursuant to any law or governmental regulation or ruling.

ARTICLE 3: TERMINATION PRIOR TO EXPIRATION OF TERM AND EFFECTS OF SUCH TERMINATION

3.1. Termination. Executive's employment with the Company shall be terminated:

    i. upon the death of Executive;

    ii. upon Executive's permanent disability, which means solely for the purpose of defining termination under this Agreement and not for the purpose of defining or determining disability rights under the Company's disability benefits policy, Executive's physical or mental incapacity to perform the essential functions of his job for a period of at least 12 weeks, with such condition likely to remain continuously and permanently ("*Permanent Disability*");

    iii. at any time during the Term, in the sole discretion of, and at the election of the Executive, (1) if the Company violates a material law related to Executive's employment or this Agreement, such violation materially interferes with Executive's ability to carry out his obligations under this Agreement, and such violation remains uncorrected for thirty (30) days following written notice of such breach to the Company by the Executive, or (2) if there is a material breach by the Company of any material provision of this Agreement which remains uncorrected for thirty (30) days following written notice of such breach to the Company by the Executive (each, a "*Company Cause*");

    iv. upon thirty (30) days' notice by Company to Executive, at any time during the Term, in the sole discretion of, and at the election of the Company, for any reason whatsoever, other than for a termination for Company Cause ("*Company Voluntary Termination*");

    v. upon any one of the following events: (1) Executive's gross negligence in the performance of the duties and services required of the Executive pursuant to this Agreement that has a material adverse effect on the Company or any Affiliate, (2) Executive's final

4

        conviction of a felony, (3) it is found that a material representation or warranty made by the Executive in this Agreement or in the Stock Purchase Agreement was known to Executive to be untrue at the time such representation or warranty was made, (4) Executive breaches a covenant or promise made in the Stock Purchase Agreement, and such breach remains uncorrected for thirty (30) days following written notice of such breach to Executive by the Company, (5) Executive materially violates the Company's Program and Practices Manual, and such violation remains uncorrected for thirty (30) days following written notice of such violation to Executive by the Company, or (6) Executive does not materially comply with any provision of this Agreement, and such non-compliance remains uncorrected for thirty (30) days following written notice of such non-compliance to Executive by the Company ("*Executive Cause*"); or

    vi.    upon thirty (30) days' notice by Executive to the Company, at any time during the Term, in the sole discretion of, and at the election of the Executive, any reason whatsoever, other than for a termination for Executive Cause ("*Executive Voluntary Termination*").

    3.2.    <u>Effects of Termination</u>.

    (A)    If Executive's employment is terminated due to (i) death, (ii) Permanent Disability, (iii) Executive Cause, or (iv) Executive Voluntary Termination, all future compensation to which Executive is otherwise entitled to and all future benefits for which Executive is eligible shall cease and terminate as of the date of termination, except as specifically provided in this Section 3.2(A). Benefits payable to Executive pursuant to the plans, programs or agreements specified or referred to in Sections 2.2, 2.3, or 2.4 shall be made in accordance with such plans, programs, agreements and the provisions of such Sections. Executive, or his estate in the case of Executive's death, shall be entitled to *pro rata* Base Salary through the date of such termination. For purposes of this Section 3.2, the *pro rata* Base Salary shall be paid in accordance with the terms of this Agreement. The Executive shall not be entitled to any other payments by or on behalf of the Company except for those which may be payable pursuant to the terms of the Company's employee benefit plans.

    (B)    If Executive's employment is terminated by reason of (i) Company Cause, or (ii) Company Voluntary Termination, Executive's Base Salary shall continue pursuant to the terms of Section 2.1 until the date that is five (5) years after the Closing Date, however, all other all future benefits for which Executive is eligible shall cease and terminate as of the date of such termination. Benefits accrued prior to termination and payable to Executive pursuant to the plans, programs or agreements specified or referred to in Sections 2.2, 2.3, or 2.4 shall be made in accordance with such plans, programs, agreements and the provisions of such Sections. The Executive shall not be entitled to any other payments by or on behalf of the Company except for those which may be payable pursuant to the terms of the Company's employee benefit plans or pursuant to the terms of this Agreement.

5

which the Company or its Affiliates use in their business to obtain a competitive advantage over their competitors. Executive further acknowledges that protection of such confidential business information and trade secrets against unauthorized disclosure and use is of critical importance to the Company and its Affiliates in maintaining their competitive position. Executive hereby agrees that Executive will not, at any time during or after his employment by the Company, make any unauthorized disclosure of any confidential business information or trade secrets of the Company or its Affiliates, or make any use thereof, except in the carrying out of his employment responsibilities hereunder. Confidential business information shall not include information in the public domain (but only if the same becomes part of the public domain through a means other than a disclosure prohibited hereunder). The above notwithstanding, a disclosure shall not be unauthorized if (i) it is required by law or by a court of competent jurisdiction or (ii) it is in connection with any judicial or other legal proceeding in which Executive's legal rights and obligations as an employee or under this Agreement are at issue; provided, however, that Executive shall, to the extent practicable and lawful in any such events, give prior notice to the Company of his intent to disclose any such confidential business information in such context so as to allow the Company an opportunity (which Executive will not oppose) to obtain such protective orders or similar relief with respect thereto as it may deem appropriate.

        4.3. All written materials, records, and other documents made by, or coming into the possession of, Executive during the period of Executive's employment by the Company which contain or disclose confidential business information or trade secrets of the Company or its Affiliates shall be and remain the property of the Company, or its Affiliates, as the case may be. Upon termination of Executive's employment by the Company, for any reason, Executive promptly shall deliver the same, and all copies thereof, to the Company.

ARTICLE 5: POST-EMPLOYMENT AND NON-COMPETITION OBLIGATIONS

        5.1. As part of the consideration for the compensation and benefits to be paid to Executive hereunder and the Stock Purchase Agreement, and as an additional incentive for the Company to enter into this Agreement, the Company and Executive agree to the non-competition provisions of this Article 5 during the Term of Executive's employment and for two (2) years after termination of employment or the expiration of this Agreement. Notwithstanding the previous sentence, in the case of a termination due to either Company Cause, or Company Voluntary Termination, the non-competition provisions of this Article 5 shall survive until seven (7) years after the Closing Date; provided, that, if after a termination due to Company Cause, or Company Voluntary Termination the Company at any time fails to pay Executive his Base Salary in accordance with the terms of this Agreement (and such failure is not cured within thirty (30) days after notice to Company by Executive of such failure), the non-competition provisions of this Article 5 shall survive until two (2) years after the date on which Executive received his final payment of the Base Salary. Executive shall not directly or indirectly: (i) engage anywhere in the world, in the Business, or (ii) the provision of any service substantially similar to or in competition with any service offered by the Company at any time during such period; (iii) be or become a stockholder, partner, owner, officer, director or employee or agent of, or a consultant to, or give financial or other assistance to, any person or entity considering engaging in any such activities or so engaged; (iv) seek in competition with the Business of the Company to procure orders from or do business with any customer of the Company; (v) solicit, or contact with a view

7

to the engagement or employment of, any person who is an employee of the Company; (vi) seek to contract with or engage (in such a way as to adversely affect or interfere with the business of the Company) any person or entity who has been contracted with or engaged to manufacture, assemble, supply or deliver products, goods, materials or services to the Company; or (vii) engage in, or participate in any effort to act to induce any of the customers, associates, consultants, and employees of the Company or any of its Affiliates to take, any action which might be disadvantageous to the Company or any of its Affiliates; provided, however, that nothing herein shall prohibit the Executive from owning, as a passive investor, stock of any corporation so engaged. The duration of the Executive's covenants set forth in this Section 5.1 shall be extended by a period of time equal to the number of days, if any, during which the Executive is in violation of the provisions hereof.

The term "*Company*" as used in this Section 5.1 shall mean and include (i) the Company's subsidiaries and Affiliates and (ii) the Company's joint venture activities (including research and development) by the Company and its Affiliates.

5.2  (A) Executive acknowledges and agrees that the covenants contained in Articles 4 and 5 hereof are fair and reasonable in light of the consideration paid hereunder, and that damages alone shall not be an adequate remedy for any breach by Executive of his covenants contained herein and accordingly expressly agrees that, in addition to any other remedies which the Company may have, the Company, on its own behalf and on behalf of any of its Affiliates, shall be entitled to injunctive relief in any court of competent jurisdiction for any breach or threatened breach of any such covenants by Executive. Nothing contained herein shall prevent or delay the Company from seeking, in any court of competent jurisdiction, specific performance or other equitable remedies in the event of any breach or intent to breach by Executive of any of its obligations hereunder.

(B) Notwithstanding the equitable relief available to the Company, the Executive, in the event of a breach of his covenants contained in Articles 4 and 5 hereof, understands and agrees that the uncertainties and delay inherent in the legal process would result in the continuing breach for some period of time, and therefore, continuing injury to the Company until and unless the Company can obtain such equitable relief. Therefore, in addition to such equitable relief, the Company shall be entitled to seek monetary damages for any such period of breach until the termination of such breach, in an amount deemed reasonable to cover all actual losses, plus all monies received by the Executive as a result of said breach. If Executive should use or reveal to any other person or entity any confidential information, this will be considered a continuing violation on a daily basis for so long a period of time as such confidential information is made use of by Executive or any such other person or entity.

(C) Notwithstanding the foregoing, Executive shall not be subject to the non-compete provisions of this Article 5 if (i) it is found by a court of competent jurisdiction in a final judgment, that the Company has improperly failed to pay Executive amounts due to Executive by the Company pursuant to this Agreement, and (ii) the Company fails to pay Executive such amount contained in such judgment by the date ordered by such court.

8

IN WITNESS WHEREOF, the Company and the Executive have duly executed this Agreement in multiple originals to be effective on the date which is first written above.

**COMPANY**

D&D PIPE AND RENTALS

By: _[signature]_
Name:    Clyde Keaton
Title:    Chairman of the Board


**EXECUTIVE**

By: _____
Name:    Dean Angelle

IN WITNESS WHEREOF, the Company and the Executive have duly executed this Agreement in multiple originals to be effective on the date which is first written above.

**COMPANY**

D&D PIPE AND RENTALS

By: _____
Name:   Clyde Keaton
Title:   Chairman of the Board


**EXECUTIVE**

By: *[signature: Dean Angelle]*
Name:   Dean Angelle