*Execution Copy*

STOCK PURCHASE AGREEMENT

BY AND AMONG

ARGO TURBOSERVE CORPORATION,
A DELAWARE CORPORATION,

DEAN ANGELLE and DENISE ANGELLE,

AND

D&D PIPE AND RENTALS, INC.,
A LOUISIANA CORPORATION,

DATED AS OF FEBRUARY 1, 2006

STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "*Agreement*") dated as of February 1, 2006, by and among ARGO TURBOSERVE CORPORATION, a Delaware limited liability company ("*Buyer*"), DEAN ANGELLE and DENISE ANGELLE (collectively, the "*Sellers*"), and D&D PIPE AND RENTALS, INC., a Louisiana corporation ("*Company*"). The term "*Party*" or "*Parties*" means the Buyer, Company, or Sellers, or all such parties, as the case may be.

RECITALS

WHEREAS, the Division (as such term is defined herein) is entering into an employment agreement with Dean Angelle (the "*Employment Agreement*") and such Employment Agreement shall commence on the Closing Date (as such term is defined herein) and shall continue until the end of the Term (as such term is defined in the Employment Agreement);

WHEREAS, Sellers own and will own as of the Closing Date all of the issued and outstanding capital stock of the Company (the "*Stock*");

WHEREAS, Sellers desire to sell, and Buyer desires to purchase, the Stock on the terms and conditions hereinafter set forth; and

WHEREAS, Buyer is purchasing all of the stock of the Company following the Closing Date, the Company will be operated as a wholly-owned subsidiary of the Buyer, operated as a new, separate and distinct division of Buyer (the "*Division*"), dedicated to the business of selling and refurbishing pipe for oil and gas application and maximizing the business opportunities related to the technology and assets transferred from the Company (the "*Business*").

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and intending to be legally bound, the Parties do hereby agree as follows:

ARTICLE I
PURCHASE AND SALE/CLOSING

1.1    <u>Transfer of the Stock by Sellers</u>.  Subject to the terms and conditions of this Agreement, Sellers agree to sell, assign and transfer good and valid title and interest in and to the Stock free and clear of all encumbrances to Buyer at the Closing (as defined herein). The Sellers shall deliver to Buyer an affidavit of lost stock certificates to Buyer,

in the form of <u>Attachment F</u> ("*Affidavit of Lost Stock Certificates*"), accompanied by a duly executed stock power in favor of Buyer.

    1.2    <u>Total Consideration and Terms</u>.

    (a)    The aggregate consideration for the Stock to be purchased by Buyer, subject to the Purchase Price Adjustment as provided in Section 1.5 (the "*Total Consideration*"), shall consist of: (i) Two Million Five Hundred Thousand Dollars ($2,500,000) (the "*Cash Consideration*"), (ii) an advance for One Million Dollars ($1,000,000) against an anticipated increase in working capital from the June 30, 2005 financial statements through the Closing (the "*Working Capital Advance*"), (iii) a secured note executed by the Division in favor of Sellers in the form attached hereto as <u>Exhibit A</u> hereto, in a principal amount equal to Five Million Dollars ($5,000,000) ("*Promissory Note*"), (iv) the Annual Earn-Out Payment (as defined herein), (v) the End of Term Earn-Out Payment (as defined herein), and (vi) the Flip Fee (as defined herein), if any.

    (b)    The Total Consideration shall be payable as follows:

    (i)    On the Closing Date, the Buyer and the Division shall pay, or cause to be paid, to Seller by wire transfer of immediately available funds: (A) the Cash Consideration and, (B) the Working Capital Advance;

    (ii)    On the Closing Date, the Company shall cause the Division to deliver to Sellers the executed Promissory Note;

    (iii)    On such dates as enumerated in, and in accordance with Section 1.6 below, the Division shall pay to Sellers an earn-out payment in an amount equal to twenty-five percent (25%) of the Excess Division Pre-Tax Net Income (as defined herein) (the "*Annual Earn-Out Payment*");

    (iv)    On such date as enumerated in, and in accordance with Section 1.7 below, the Division shall pay to Sellers an end of term payment in an amount equal to ten percent (10%) of the EBITDA Multiplier (as defined herein) (the "*End of Term Earn-Out Payment*"); and

    (v)    On such date as enumerated in, and in accordance with Section 1.8 below, the Division shall pay to Sellers a flip fee ("*Flip Fee*").

    1.3    <u>The Closing</u>. The closing shall take place at the offices of Boies, Schiller & Flexner, LLP, 570 Lexington Avenue, New York, New York, ("*Closing*") as soon as practicable after all conditions specified in Articles IV and V have been satisfied or waived in accordance with this Agreement, but not later than the fifth business day following the date that all conditions specified in Articles IV and V have been satisfied or waived in accordance with this Agreement, or at such other place or on such other date as Sellers and Buyer may mutually agree, and such date that the Closing occurs shall be the closing date ("*Closing Date*").

1.4     Closing Deliveries.  At the Closing, Sellers will deliver or cause to be delivered to Buyer:

(a)     The Affidavit of Lost Stock Certificates, accompanied by a duly executed stock power in favor of Buyer, such stock power, in form satisfactory to the Buyer; and

(b)     A certificate signed by Sellers stating that, (i) the representations and warranties of Sellers contained in this Agreement are true and correct in all material respects as of the Closing Date, with the same force and effect as if made on the Closing Date, and (ii) the covenants and agreements contained in this Agreement to be complied with by Sellers and Company at or prior to the Closing Date have been complied with.

1.5     Purchase Price Adjustment.

(a)     Within thirty (30) days after the Closing Date, Sellers shall deliver to the Division the February 28, 2006 financial statements, prepared on an income tax basis of accounting, enumerating the Current Assets and Current Liabilities (each as defined herein) of the Company as of February 28, 2006 ("*Final Report*").  Within ninety (90) days after the Division receives the Final Report from Sellers, the Division shall deliver to Sellers a report of the Division's certified public accountants showing in detail the final determination of any required adjustments to the Working Capital (the "*Division's Report*") together with any documents substantiating the final calculations and adjustments.

(b)     If Sellers conclude that the Division's Report does not accurately reflect the adjustments to be made to the Total Consideration in accordance with this Section 1.5, Sellers shall, within ten (10) days after its receipt of the Division's Report, provide to the Division its written statement of any discrepancies believed to exist.  The Division and Sellers shall use good faith efforts to jointly resolve the discrepancies within ten (10) days of the Division's receipt of Sellers' written statement of discrepancies, which resolution, if achieved, shall be binding upon all Parties, and not subject to dispute or judicial review.  If the Division and Sellers cannot resolve the discrepancies to their mutual satisfaction within such ten (10) day period, the Division and Sellers shall, within the following ten (10) days, jointly designate an independent public accounting firm to be retained to review the Final Report, the Division's Report, together with Sellers' discrepancy statement and any other relevant documents.  The Parties agree that the foregoing independent public accounting firm shall not be one that is, or within two (2) years prior to the Closing Date has been, regularly engaged by any Party.  Such firm shall report its conclusions as to adjustments pursuant to this Section 1.5, which shall be conclusive on all parties to this Agreement and not subject to dispute or judicial review.  The cost of retaining such independent public accounting firm shall be borne by the Party whose amounts, on the Division's Report or Sellers' written statement of any discrepancies thereto, were further from the determination of the conclusion of the independent public accounting firm as to the adjustments pursuant to this Section 1.5.

Notwithstanding the previous sentence, in the event that the conclusion of the independent public accounting firm is that the Parties' discrepancy is less than Twenty-Five Thousand Dollars ($25,000), the parties will equally bear the costs of such accounting firm. Buyer shall provide Sellers with reasonable access to all records that the Division has in its possession that are necessary for Sellers to review the Division's Report.

(c) If the amount of Working Capital (as defined below) on February 28, 2006 is less than the Target Working Capital, (such shortfall, the "*Working Capital Shortfall*"), the following shall occur: (i) the Interest Rate (as such term is defined in the Promissory Note) of the Promissory Note shall be reduced by four (4) percentage points, and (ii) the first payment or payments (in whole or in part), as the case may be, of the Promissory Note shall have been deemed to have been made by the Division in an amount equal, dollar for dollar, to the Working Capital Shortfall.

(d) If the amount of Working Capital (as defined below) on February, 28, 2006 is subsequently found to be greater than the Target Working Capital, (such excess, the "*Working Capital Excess*"), the amount of Working Capital Excess shall be paid in immediately available funds to Sellers by the Division within five (5) business days of the final determination of the Working Capital.

(e) For the purpose of this Section 1.5, the following definitions shall apply:

i. "*Current Assets*" shall mean as of February 28, 2006, all cash and cash equivalents, inventory, work in progress, accounts receivable (adjusted for an allowance for doubtful accounts or, if the direct charge-off method has been employed, the then-collectible Accounts Receivable), notes receivable (other than notes and loans receivable from the Sellers and other Advances, which shall have been previously paid), prepaid expenses, federal and state income tax receivables, Taxes and other current assets consistently reported in accordance with the financial statements and in each case in accordance with generally accepted accounting principles ("*GAAP*"). For purposes of calculating Current Assets, accounts receivable shall not include: (A) items that have not shipped, (B) accounts that are determined not to be collectible (as such determination is made in accordance with Section 2.6 herein), and (C) any items of work in progress that are not listed on the Disclosure Schedule attached hereto as Exhibit D.

ii. "*Current Liabilities*" shall mean as of February 28, 2006, all accounts payable, accrued expenses, current portion of bank notes payable, Taxes and unearned income consistently reported in accordance with the Company's financial statements and in each case in accordance with GAAP.

iii. "*Target Working Capital*" shall mean the sum of (i) the amount of Working Capital (as defined below) showing on the financial statements of the Company as of June 30, 2005, which has been determined to be Nine Hundred Fifty-

Eight Thousand Two Hundred Forty-Two Dollars ($958,242), and (ii) One Million Dollars ($1,000,000).

    iv.    *"Working Capital"* shall mean Current Assets less Current Liabilities of the Company. The Total Consideration paid by the Division to Seller, including the Working Capital Advance, shall not be included in the Working Capital calculation.

1.6    <u>Annual Earn-Out Payment</u>

(a)    Subject to Section 1.6(b) below, for each Earn-Out Period, Sellers shall receive an Annual Earn-Out Payment in an amount equal to twenty-five percent (25%) of the Excess Division Pre-Tax Net Income for such Earn-Out Period. For purposes of calculating the Annual Earn-Out Payment, the following definitions shall apply:

    i.    *"Earn-Out Period"* means each of the following calendar years: (i) 2006, (ii) 2007, (iii) 2008, (iv) 2009, and (v) 2010.

    ii.    *"Excess Division Pre-Tax Net Income"* means an amount equal to (A) the Division's Pre-Tax Net Income for the Earn-Out Period, less (B) One Million Eight Hundred Thousand Dollars ($1,800,000). For purposes of this definition, any number less than zero (0) shall be deemed zero (0).

    iii.    *"Pre-Tax Net Income"* or *"PTNI"* means an amount equal to (A) sales billed by the Division in the applicable Earn-Out Period, <u>less</u> (B) in such Earn-Out Period: (1) the cost and expense of materials, (2) all costs and charges directly incurred calculated according to GAAP, including, but not limited to, dedicated Division personnel that the Buyer may require, (3) an overhead charge charged by Buyer in each Earn-Out Period in the amount of Two Hundred Fifty Thousand Dollars ($250,000), (4) a charge, not to exceed One Hundred Fifty Thousand Dollars ($150,000), for Division senior management, and (5) interest assessed by Buyer directly related to the Division (excluding interest on the Promissory Note).

(b)    If the Employment Agreement is terminated for any reason other than for Company Cause or Company Voluntary Termination (as such terms are defined in the Employment Agreement), the right to receive an Annual Earn-Out Payment shall terminate on the date of such termination of the Employment Agreement, and Sellers shall be entitled to an amount equal to the *pro rata* Annual Earn-Out Payment earned in the calendar year of such termination date in accordance with Section 1.6(c) below.

(c)    For each Earn-Out Period, Annual Earn-Out Payment shall be paid on the date that is earlier of: (i) thirty (30) days after the conclusion of the Division's final audit for such Earn-Out Period, or (ii) March 31st of the year following the calendar year that the Annual Earn-Out Payment was earned.

1.7    <u>End of Term Earn-Out Payment</u>.

(a) The Division shall pay to Sellers an End of Term Earn-Out Payment equal to ten percent (10%) of the EBITDA Multiplier within ninety (90) days after the date that is five (5) years after the Closing Date; provided, that, no such End of Term Earn-Out Payment shall be paid by the Division if the Employment Agreement is terminated for any reason other than for Company Cause or Company Voluntary Termination (as such terms are defined in the Employment Agreement).

(b) For purposes of calculating the End of Term Earn-Out Payment, the following definitions shall apply:

i. *"Adjusted EBITDA"* means EBITDA less the following costs: (A) a forty percent (40%) per annum cost of capital for those investments in the Division that exceed fifty percent (50%) of eligible inventory Division and seventy-five percent (75%) of eligible receivables, and (B) the Total Consideration. Adjusted EBITDA shall be calculated and certified on an annual basis by the Division's certified public accountant.

ii. *"EBITDA"* means consolidated earnings of the Division before adjustment for interest, income taxes, depreciation and amortization, all as determined in accordance with GAAP applied consistently.

iii. *"EBITDA Multiplier"* means an amount equal to six-times Adjusted EBITDA; provided, that, if the average increase in Adjusted EBITDA is less than fifteen percent (15%), the EBITDA Multiplier shall be equal to four-times Adjusted EBITDA.

1.8   Sale of Division by Company.

(a) If Buyer transfers the Division to a third party, Buyer shall cause the Division to pay to Sellers a Flip Fee in an amount equal to ten percent (10%) of the Division Net Sale Value. Neither Buyer or the Division shall be required to pay to Sellers a Flip Fee if (i) the Employment Agreement has been terminated for any reason other than for Company Cause or Company Voluntary Termination, or (ii) except as provided for in Section 1.8(b), Buyer transfers the Division any time after the date that is five (5) years after the Closing Date.

(b) For purposes of this Section 1.8, *"Division Net Sale Value"* means the total purchase price paid by such third party less the book value of the Division. Sellers shall have the right to receive such payment upon the same terms and conditions as Buyer receives the purchase price payment from such third party. For purpose of this Section 1.8, *"Transfer"* means any sale, assignment, transfer, conveyance or other disposition to a third party of all, or substantially all, of the Division's assets or stock. This Section 1.8 does not apply to transfers to Affiliates of the Company, however, should there be a Transfer of the Division's assets or stock to any Affiliate of the Company, such Affiliate shall be bound by the terms of this Section 1.8 and the provisions of Sections 1.6 and 1.7 of this Agreement. A Transfer that occurs any time after the fifth (5th) anniversary of the

Closing Date, but before the sixth (6th) anniversary of the Closing Date shall be deemed a Transfer for purposes of this Section 1.8 if substantial negotiations for such Transfer took place after the fourth (4th) anniversary of the Closing Date, but before the fifth (5th) anniversary of the Closing Date.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers jointly and severally represent and warrant that:

2.1     Organization and Qualification. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Louisiana and has all necessary corporate power to own its properties and to operate its business as now owned and operated by it; and neither the ownership of its properties nor the nature of its business requires the Company to be qualified in any jurisdiction other than the State of Louisiana, except those jurisdictions contained on the Disclosure Schedule attached hereto as Exhibit D.

2.2     Financial Statements. Exhibit C to this Agreement sets forth the unaudited balance sheets and related statements of income and retained earnings of the Company, as of January 31, 2005. The January 31, 2005 statements shall be delivered to Buyer at least five (5) business days prior to the Closing Date. Each of the foregoing financial statements has been and will be prepared on a consistent basis throughout the periods indicated and fairly present the financial position as of the respective dates of the balance sheets included and the results of operations for the respective periods indicated. Except as disclosed on the Disclosure Schedule, the Company has no known Material debt, liability or obligation of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, that is not reflected in the financial statements attached as Exhibit C. For purposes of this Article II, the term "*Material*" shall mean any liability or obligation in excess of Five Thousand Dollars ($5,000).

2.3     Absence of Specific Changes. Except as identified on the Disclosure Schedule, since December 31, 2005, there have not been any:

(a)     Transactions by the Company outside the ordinary course of business as conducted on that date;

(b)     any Material Capital expenditures by the Company;

(c)     Material adverse changes in the financial condition, liabilities, assets, business or prospects of the Company;

(d)     Destruction, damage to or loss of any Material asset of the Company:

(e) Labor trouble including but not limited to charges of unfair labor practices, grievances filed under any collective bargaining agreement, arbitration awards, EEOC charges, state employment discrimination charges, OSHA compliance issues, wrongful discharge claims or other event or condition of any character which would have a material adverse effect on the financial condition, business, assets, or prospects of the Company's business;

(f) Changes in accounting methods or practices;

(g) Sale or transfer of any asset of the Company, except in the ordinary course of business;

(h) Amendment or termination of any contract, agreement or license, except in the ordinary course of business, and all of such amendments or terminations in the ordinary course of business are identified on the Disclosure Schedule attached hereto;

(i) Mortgages, pledges or other encumbrances upon any asset of the Company;

(j) Agreement by any of the Sellers to do any of the foregoing; or

(k) Payment of any dividends, distributions, or shareholder loans.

2.4 <u>Tax Returns and Audits</u>. Within the time and manner prescribed by law, the Company has filed all federal, state and local tax returns required by law and has paid all Taxes, assessments and penalties due and payable. The charges, accruals and reserves which have been made by the Company in respect to federal, state, county, local and foreign taxes, including, but not limited to any sales taxes, are adequate to cover the payment of the Taxes accrued and unpaid for all periods through and including the last day prior to the Closing Date, whether or not disputed. The Company is not a party to any pending action or proceeding, nor is, to the knowledge of Sellers and the Company, any such action or proceeding threatened by any government authority, for the assessment or collection of any Taxes, interest, assessment or deficiencies and no claims for assessment or collection of any Taxes has been asserted against the Company.

2.5 <u>Tangible Personal Property</u>. Except as indicated on the Disclosure Schedule, no personal property used by the Company in connection with its business is held under any lease, security agreement, conditional sales contract, or other title retention or security agreement, or is located other than in the possession of the Company at its place of business, or located in Houston, Texas at the location indicated on the Disclosure Schedule, or delivered at the Closing (with respect to certain back-up records of the Company). Sellers have identified on the Disclosure Schedule all Company automobiles ("*Company Vehicles*") and all loans and indebtedness relating to such Company Vehicles ("*Vehicle Loans*").

2.6 <u>Accounts Receivable</u>. Sellers shall have identified on the Disclosure Schedule a complete and accurate schedule of the accounts receivable of the Company as of the Closing Date, together with an accurate aging of these accounts. These accounts receivable arose from valid transactions in the ordinary course of business. Each Seller represents that, to its best knowledge, and except as disclosed on the Disclosure Schedule, all the accounts receivable identified in such Disclosure Schedule are collectible, are not disputed, and represent valid obligations of the named account obligor. Sellers and the Division agree that the Division's certified public accountant shall determine, for purposes of this Agreement, whether or not an account is collectible. Any accounts as of the Closing Date not disclosed as uncollectible on the Disclosure Schedule and subsequently found to be uncollectible shall be credited to the Division and are the responsibility of the Sellers. If an account that was determined to be uncollectible is subsequently collected, such amount that is collected, net of any expenses incurred in such collection, shall be credited to the Sellers.

2.7 <u>Trade Names, Trademarks, Copyrights And Patents</u>. All copyright, trademark or trade name registrations, patents and all applications pending thereon, which are owned or used by the Company and all material trademark, trade name, copyright, patent or know-how licenses granted by or to the Company are set forth on the Disclosure Schedule attached hereto together with all registration, patent numbers or other identification information with respect thereto. The Company owns or possesses adequate rights to use all trademarks, trade names, copyrights, patents, know-how and other proprietary information used or held for use in connection with its business as currently being conducted and the validity and the rights thereto of the Company have not been questioned in any litigation to which the Company or any affiliate is a party nor is any such litigation threatened. To the knowledge of Sellers and the Company, the Company has not infringed and/or is not now infringing, on any of the trade names, trademarks, service marks, copyrights, or patents belonging to any other person, firm, or corporation.

2.8 <u>Title to Assets</u>. The Company has good and marketable title to all of its assets, whether real, personal or mixed, tangible and intangible. Except as indicated on the Disclosure Schedule, the assets are free and clear of restrictions on or conditions to transfer or assignment, and free and clear of mortgages, liens, pledges, charges, encumbrances, conditions, and any restrictions.

2.9 <u>Customers</u>. Sellers have identified on the Disclosure Schedule a correct and current list of customers of the Company, together with summaries of the services provided to such customers during the Company's most recent fiscal year. The Company has no information, nor is aware of any facts, indicating that any of these customers intend to cease doing business with the Company, or materially alter the amount of business that they are presently doing with the Company.

2.10 <u>No Regulatory Violation</u>. Except as identified on the Disclosure Schedule, the Company has received no notice of any violation of any law, order, rule, regulation, writ, injunction or decree of any governmental authority or court, domestic or

foreign, and, to the best of the Sellers' knowledge, there are no such violations. In addition, the execution of this Agreement and the consummation of the transactions contemplated hereby will not result in any such violation.

2.11  **Pending Litigation.** Except as disclosed on the Disclosure Schedule, there is no suit, action, arbitration or legal, administrative or other proceeding or government investigation pending or threatened against or affecting the Company's business, business prospects, assets or financial condition.

2.12  **Authority and Consent.** The Company has the right, power, legal capacity and authority to enter into, and perform its obligations under this Agreement. All approvals and consents of any party necessary in connection with this transaction have been obtained by the Company. Sellers are the sole stockholders of the Company. The execution and delivery of this Agreement by the Company has been duly authorized by the Company's Board of Directors and stockholders and constitutes a valid and binding agreement of Sellers, enforceable in accordance with its terms.

2.13  **Contract Documents.** All agreements and contracts to which the Company is a party are scheduled and identified on the Disclosure Schedule attached hereto (collectively hereinafter referred to as "*Contract Documents*"). Copies of the Contract Documents shall be furnished to Buyer by the Company or Sellers immediately upon Buyer's request.

2.14  **Employment Matters.** The Disclosure Schedule lists a true and accurate accounting (the "*Employee List*") of the names and addresses of all employees of the Company together with employee's name, home address, job position, rate of pay, date and amount of last salary increase, date of hire and social security number. The Disclosure Schedule also sets forth a description of all employment and consulting agreements, executive compensation plans, deferred compensation agreements, profit sharing plans, employee pension and other retirement plans, death benefit plans, sickness or disability plans, severance plans, educational assistance plans, employee stock options or stock purchase plans and group life, health and accident insurance and other employee benefit plans, agreements, arrangements or commitments, whether or not legally binding, including without limitation fringe benefit programs or practices, holiday, vacation and other bonus practices, whether written or oral, and whether express or implied, to which the Company is or has been a party.

2.15  **Environmental and Safety Laws.** Except as listed on the Disclosure Schedule, the Company is not in violation of any applicable federal, state or local statute, law, permit, ordinance, rule, code or regulation relating to any environmental matter or occupational health and safety matters ("*Environmental Law*"), and no expenditures are or will be, as of the Closing Date, required in order to comply with any such statute, law or regulation relating to the Company's business.

2.16  **Subsidiaries.** The Company has no subsidiaries.

2.17 **No Contractual Violations.** Neither the execution of this Agreement nor the performance of Sellers' obligations pursuant hereto or the consummation of the transactions contemplated hereby, will conflict with, or result in a breach or violation of any of the terms or provisions of, or constitute, or with the passage of time or the giving of notice constitute, a default under any indenture, mortgage, deed of trust, voting trust agreement, loan agreement, bond debenture, note agreement or other evidence of indebtedness, lease, contract or other agreement or instrument to which Sellers or the Company are a party, or by which it is bound, or the Company's Articles of Incorporation or Bylaws.

2.18 **Capital Structure.** The stock Buyer is purchasing under this Agreement is all of the authorized, certificated and uncertificated capital stock of the Company consisting of One Hundred (100) shares of common stock, no par value, of which One Hundred (100) shares are issued and outstanding. All outstanding shares are validly issued fully paid and non-assessable, and such shares have been issued in full compliance with all federal and state securities laws. There are no outstanding subscriptions, options, rights, warrants, convertible securities, or other agreements or commitments obligating the Company to issue or to transfer any additional shares of its capital stock of any class. The Sellers and the Company have never transferred or issued any shares of the Company to any third party or made commitments obligating the Sellers or the Company to issue or to transfer any shares of its capital stock of any class to any third party. There are no unauthorized shares of the Company outstanding.

2.19 **Sellers' Authority.** Sellers have the requisite right, power, legal capacity and authority to enter into and perform the obligations under this Agreement. All approvals and consents of any parties necessary in connection with this transaction and all applicable Transaction Agreements have been obtained by Sellers. For purposes of this Agreement, the term *"Transaction Agreements"* means (i) this Agreement, (ii) the Promissory Note, (iii) the Parent Guaranty; (iv) the Lease Agreement, (v) the Employment Agreement.

2.20 **Title to Shares.** Sellers are the owners, beneficially and of record, of all of the Stock in the Company, free and clear of all liens, encumbrances, security agreements, equities, options, claims, charges and restrictions whatsoever.

2.21 **Real Property.** Except as identified on the Disclosure Schedule, the Company does not own or lease any real property.

2.22 **Company Accounts.** Sellers have identified on the Disclosure Schedule a complete and accurate list of the names and addresses of all banks or other financial institutions in which the Company has an account, deposit or safe deposit box, with the names of all persons authorized to draw on these accounts or deposits or to have access to theses boxes. Sellers have identified on the Disclosure Schedule the principal amount drawn on the Whitney National Bank Business Line of Credit as of the Closing Date.

2.23 <u>Full Disclosure</u>. None of the representations and warranties made by Sellers, or made in any certificate, Disclosure Schedule, or memorandum furnished or to be furnished pursuant to this Agreement, contains or will contain any untrue statement of a material fact, or omit any statement or fact the omission of which would be misleading.

ARTICLE III
BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants that:

3.1 <u>Organization</u>. Buyer is a limited liability company duly organized, existing and in good standing under the laws of the State of Delaware. The execution and delivery of this Agreement and the consummation of the transaction by Buyer have been duly authorized and no further corporate authorization is necessary on the part of Buyer.

3.2 <u>No Violation of Laws; Consents</u>. Neither the execution and delivery of this Agreement or any other agreement to which Buyer is or is to become a party, the consummation of the transactions contemplated hereby or thereby nor the compliance with or fulfillment of the terms, conditions or provisions hereof or thereof by Buyer will: (i) contravene any provision of the governing documents of Buyer or (ii) violate any law or any judgment or order of any governmental body to which Buyer is subject or by which any of its assets may be bound or affected. No consent, approval or authorization of, or registration or filing with, any person is required in connection with the execution or delivery by Buyer of this Agreement or any of the other agreements to which Buyer is or is to become a party pursuant to the provisions hereof or the consummation by Buyer of the transactions contemplated hereby or thereby.

3.3 <u>Pending Litigation</u>. There is no suit, action, arbitration or legal, administrative or other proceeding or government investigation pending or, to the knowledge of Buyer, threatened against or affecting the Buyer's business, business prospects, assets or financial condition.

3.4 <u>Authority; Enforceability</u>. Buyer has the right, power, legal capacity and authority to enter into, and perform its obligations under this Agreement and to bind and cause the Division to perform Division obligations as enumerated hereunder. The execution and delivery of this Agreement and any other agreement contemplated herein by Buyer has been duly authorized by the Buyer's board of directors and constitutes a valid and binding agreement of Buyer and the Division, enforceable against each party, in accordance with its terms.

ARTICLE IV
COMPANY'S AND SELLERS' OBLIGATIONS BEFORE CLOSING

Sellers and the Company covenant that from the date of this Agreement (unless a different date is indicated) through and including the Closing Date:

4.1 **Buyer's Access To Premises And Information**. Buyer, its counsel, its accountants and other representatives shall have full access during normal business hours to all properties, accounts, records, contracts and documents of or relating to the Company's business or as may be necessary to determine the accuracy of Sellers' representations and warranties. The Company shall furnish or cause to be furnished to Buyer and its representatives all data and information concerning the business, finances and properties of the Company as Buyer shall reasonably request. The Company shall provide Buyer with copies of all of its Contract Documents, trademarks and trade name registrations, patents and patent applications, within fifteen (15) days of the date hereof.

4.2 **Conduct of Business In Normal Course**. The Company will carry on its business and activities diligently and in substantially the same manner as previously had been carried out and shall not make or institute any unusual or novel business practice which varies from the methods used by the Company as of the date hereof. Except as identified on the Disclosure Schedule, the Company shall not pay any dividend or other distribution with respect to its stock nor any compensation, bonus or other consideration to its shareholders or employees other than salaries and benefits which are in effect as of January 31, 2006.

4.3 **Preservation Of Business And Relationships**. Each Seller will use its best efforts to preserve the Business intact and to preserve the present relationships of the Company with its customers, suppliers and employees.

4.4 **Representations And Warranties At Closing**. Except as disclosed in the Disclosure Schedule at or prior to the Closing, all representations and warranties of Sellers set forth in this Agreement and any written statements delivered to Buyer under this Agreement will be true and correct as of the Closing Date as if made on that date.

4.5 **Exclusive Dealings**. Sellers and the Company agree that prior to the Closing Date it shall not enter into or conduct any discussions, directly or indirectly, with any other prospective purchaser, suitor or other entity interested in acquiring, merging with, consolidating or conducting any other type of business combination with Sellers or the Company or its assets, without the prior written consent of Buyer.

4.6 **Prompt Action**. Sellers and the Company agree that each will promptly take all action necessary to complete the transactions contemplated by this Agreement.

4.7 **Confidentiality**. Sellers and the Company will treat this Agreement, and the transactions contemplated hereby, as confidential, and will not issue any press release or otherwise provide any information to persons, other than its representatives and agents working on such transaction, regarding such transactions without the prior written consent of Buyer.

4.8     Corporate Matters. Except as specifically contemplated by this Agreement, Sellers and the Company shall not (i) amend its Articles of Incorporation to Bylaws, (ii) issue any shares of its capital stock, (iii) issue or create any warrants, obligations, subscriptions, options, convertible securities or other commitments under which any additional shares of its capital stock of any class might be directly or indirectly authorized, issued or transferred from treasury, or (iv) agree to do any of the acts listed above.

## ARTICLE V
## BUYER'S OBLIGATIONS BEFORE CLOSING

5.1     Cooperation in Securing Consents of Third Parties. Buyer will use its reasonable best efforts to assist the Company in obtaining the consent of any necessary third persons or agencies to the transaction contemplated hereby.

5.2     Representations and Warranties at Closing. All representations and warranties of Buyer set forth in this Agreement and any written statements delivered to Sellers or Company under this Agreement will be true and correct as of the Closing Date as if made on that date.

5.3     Prompt Action. Buyer agrees that it will promptly take all action necessary to complete the transactions contemplated by this Agreement.

5.4     Confidentiality. Until the Closing Date, Buyer will treat this Agreement, and the transactions contemplated hereby, as confidential, and will not issue any press release or otherwise provide any information to persons, other than its representatives and agents working on such transaction, regarding such transactions without the prior written consent of Sellers.

## ARTICLE VI
## CLOSING CONDITIONS OF BUYER

Buyer's obligations to purchase the Stock are subject to the fulfillment or written satisfaction, or waiver by, the Buyer, on or prior to the Closing Date of all of the conditions set forth in this Section VI. Each Seller acknowledges and agrees that Buyer shall not owe Sellers or the Company any amount for a failure of the Closing to occur as a result of a closing condition.

6.1     Representations and Warranties True. All representations and warranties made by Sellers contained in this Agreement, the Disclosure Schedule, or in any written statement, are true and correct as if made on the Closing Date.

6.2     Satisfactory Due Diligence. Buyer shall be satisfied in its sole discretion (i) that any matters included in the Disclosure Schedule which Buyer deems to

be unacceptable and which have been specified in writing to Sellers have been remedied to Buyer's satisfaction, and (ii) with the results of its business, technical, legal and financial review of the books, records, agreements and other legal documents and business organization of the Company.

6.3   Consents, Approvals and Waivers. Sellers, Buyer and Company shall have obtained, in a manner satisfactory to Buyer and its counsel, any and all approvals, consents, permits and waivers and made all filings necessary or appropriate for the sale and transfer of the Stock pursuant to this Agreement and to complete the related transactions as contemplated herein.

6.4   Covenants. All covenants, agreements and conditions contained in this Agreement to be performed by the Parties on or prior to the Closing Date shall have been performed or complied with in all respects.

6.5   Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions shall be satisfactory in substance and form to Buyer and its counsel, and Buyer and its counsel shall have received all such counterpart originals or certified or other copies of such documents and instruments as they may reasonably request.

6.6   No Adverse Change. During the period from the date hereof until the Closing Date, there shall have been no material adverse change in the financial condition or business of the Company.

6.7   Absence of Litigation. No action, suit or proceeding before any court or government body, pertaining to the transaction contemplated by this Agreement or the Company, shall have been instituted or threatened on or before the Closing Date.

6.8   No Change In Status or Condition Of Assets. There shall have been no material change in the condition of any of the assets, whether tangible or intangible, of the Company and no proceeding with respect to any of the assets.

6.9   Employment Agreement. Dean Angelle will have entered into an employment agreement with the Division, substantially in the form attached as Exhibit E hereto.

6.10   Employee Confidentiality Agreements. All key personnel of the Company shall enter into non-compete and confidentiality agreements with the Division, in the form or forms as the Buyer may reasonably request.

6.11   Lease Agreement. Sellers shall have entered into a Lease Agreement with Sellers' company, Angelle Properties, L.L.C., to lease the property located at 2450 S.E. Evangeline Throughway, Lafayette, Louisiana (the "*Property*") substantially in the form attached as Exhibit G.

Case 1:07-cv-08410-RMB-GWG   Document 21-2   Filed 12/22/2007   Page 17 of 19
Execution Copy

ARTICLE VII
CONDITIONS PRECEDENT TO SELLERS' PERFORMANCE

The obligations of the Sellers to consummate their obligations under this Agreement are subject to the satisfaction, on or before the Closing Date, of all of the following conditions:

7.1  Accuracy of Buyer's Representations And Warranties.  All representations and warranties of Buyer contained within this Agreement or in any written statement delivered by Buyer under this Agreement shall be true on and as of the Closing Date as though such representations and warranties were made on such date.

7.2  Buyer's Performance.  Buyer shall have performed and complied with all of the covenants and agreements and satisfied all conditions that it is required by this Agreement to perform, comply with or satisfy before the Closing Date.

7.3  Employment Agreement.  The Division will have entered into an employment agreement with Dean Angelle, substantially in the form attached as Exhibit E hereto.

7.4  Lease Agreement.  The Division shall have entered into a Lease Agreement with Sellers' company, Angelle Properties, L.L.C., substantially in the form attached as Exhibit G.

ARTICLE VIII
ADDITIONAL AGREEMENTS

8.1  Confidentiality.  For a period of five (5) years from the date of this Agreement, the Sellers shall hold in confidence and use their reasonably best efforts to have all of their respective employees, agents, representatives and affiliated companies hold in confidence all documents and other written material containing information of a confidential nature belonging to the other Party (including, but not limited to, the intellectual property rights), and, except as contemplated by this Agreement, shall not disclose, publish, use or permit others to use the same; provided, however, that the foregoing restriction shall not apply to any portion of the foregoing which: (i) becomes generally available to the public in any manner or form through no fault of either Party, or their respective employees, agents or representatives; (ii) is released for disclosure by one Party with the other Party's consent, or (iii) when such disclosure is required by a court or a governmental agency or is otherwise required by law or is necessary in order to establish rights under this Agreement or any other agreements referred to herein.

8.2  Payment of Expenses.  Whether or not the transactions contemplated by this Agreement are consummated and, except as otherwise may be expressly provided

herein, each Party shall pay its own fees, expenses and disbursements and those of its respective agents, representatives, consultants, accountants and counsel incurred in connection with this Agreement and all other costs and expenses incurred in the performance and compliance with all conditions to be performed by such Party under this Agreement. It is understood and agreed to by the Parties that Sellers will cause the Company to pay the expenses that are directly related to the transactions contemplated by this Agreement on or prior to the Closing Date.

       8.3      <u>Information Relating To Taxes</u>. Sellers shall furnish to Buyer and the Division from time to time after the Closing Date any information reasonably requested by Buyer or the Division which is in the possession of or reasonably available to Sellers to permit Buyer or the Division: (i) to file on a timely basis its federal income tax returns and its estimated federal income tax returns and any other Tax returns which may be required by any federal, state, local or foreign tax authority, and (ii) to comply with orders issued by any federal, state, local or foreign governmental authority.

       8.4      <u>Further Assurances</u>. Sellers, at any time after the Closing Date, at the request of Buyer, or the Division, shall execute, acknowledge and deliver any further assignments, conveyances and other assurances, documents and instruments of transfer, and will take any other action consistent with the terms of this Agreement, that may reasonably be necessary for the purpose of assigning, granting and confirming to Buyer all Stock and assets to be conveyed pursuant to this Agreement. Sellers shall not voluntarily undertake any course of action which materially interferes in any way with the rights obtained by Buyer hereunder or is otherwise inconsistent with the satisfaction of its obligations or agreements set forth in this Agreement.

       8.5      <u>No Merger, Non-Compete</u>. For five (5) years after the Closing Date, (i) if Buyer acquires another entity to be added to the Division, then Sellers shall have the right to maintain the Division's accounting and books and records separate from the new entity's accounting, books and records for purposes of the calculation of the Annual Earn-Out Payment, End of Term Earn-Out Payment, and Flip Fee, and (ii) Buyer, and its Affiliates shall not engage in a business that competes with the Business; <u>provided that</u>, if the Employment Agreement is terminated for any reason other than for Company Cause or Company Voluntary Termination (as such terms are defined in the Employment Agreement), this Section 8.5 shall become null and void and have no effect as of the termination date of the Employment Agreement. "*Affiliate*" as used in this Agreement means, with respect to either Party, any individual or entity that directly or indirectly controls, is controlled by or is under common control with that Party. As used in this definition, "control" means either (i) the ownership of greater than 50% of an entity's voting securities, or (ii) the ability, through contract or otherwise, to determine an entity's operating activities.

       8.6      <u>Access to Buyer's Records</u>. After the Closing, Sellers, their counsel, their accountants and other representatives shall have reasonable access during normal business hours to Buyer's and the Division's properties, accounts, records, contracts and documents as may be necessary to determine the Annual Earn-Out Payment, End of Term

Earn-Out Payment, and Flip Fee. Buyer shall furnish or cause to be furnished to Sellers and their representatives' data and information concerning the Business, finances and properties of the Division and Buyer as Sellers shall reasonably require and request.

8.7    Indebtedness.

(a)    Within thirty (30) days after the Closing Date, the Division shall cause to have that certain One Million Five Hundred Thousand Dollar ($1,500,000) Whitney National Bank Business Line of Credit satisfied in full. If the Division shall fail to satisfy such debt, the Division shall, in accordance with Article IX herein, indemnify and hold Sellers harmless from any liabilities directly stemming from such failure that occurs after the Closing Date. Any claims pursuant to this Section 8.6 shall not count against the Basket (as defined herein).

(b)    On the Closing Date, the Division shall assume the Company Vehicles and the Vehicle Loans.

8.8    Environmental Inspection and Testing. Buyer shall, at their sole cost and expense, conduct a Phase II environmental assessment of the Property which will include, but not be limited to certain of the soils, including invasive boring and testing, of the Property. If the Phase II environmental assessment of the Property recommends environmental remediation measures with respect to the Property or other equipment and facilities affecting the Property (the "*Environmental Remediation*"), Sellers shall promptly conduct the Environmental Remediation at their sole cost and expense, and such Environmental Remediation shall be promptly performed with minimal interruption to the Division's business activities at the Property. The Environmental Remediation shall be deemed complete upon the preparation and delivery to Buyer of a report by a licensed environmental engineer reasonably satisfactory to Buyer that the Property (i) is free of any hazardous materials or hazardous substances (as such terms are defined by Environmental Laws), (ii) is in a condition that meets all requirements of law, including but not limited to the State of Louisiana Department of Environmental Quality Consolidated Compliance Order & Notice of Potential Penalty dated as of February 19, 2004, and (iii) that any leakage from any equipment or facilities affecting the tested soils has been appropriately remediated (the "*Remediation Report*"). The date the Remediation Report is deemed complete shall be the "*Remediation Report Date*". If the Sellers fail to satisfy their obligations under this Section 8.8, Sellers shall, in accordance with Article IX herein, indemnify and hold Buyer's Indemnified Parties harmless from any liabilities directly stemming from such failure.

ARTICLE IX
INDEMNIFICATION

9.1    Indemnification By Sellers.

(a)    Sellers, jointly and severally, agree to indemnify and hold Buyer, the Division, and each of their employees, officers, directors, shareholders, subsidiaries, members, employees and agents and the successors, heirs and personal representatives of