## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT, dated as of March 3, 2006, is made by Dean Angelle and Denise Angelle, (collectively, the "Subordinated Creditor"), for the benefit of Wells Fargo Bank, National Association (with its participants, successors and assigns, the "Senior Lender"), acting through its Wells Fargo Business Credit operating division.

### BACKGROUND

Argo Turboserve Corporation, a Delaware corporation ("Argo"), D&D Pipe and Rentals, Inc., a Louisiana corporation ("D&D", together with Argo, each a "Borrower" and collectively, the "Borrowers") and ATC Energy Services, LLC ("ATC" together with Borrowers, each a Company and collectively, "Companies"), are now or hereafter may be indebted to the Senior Lender on account of loans or the other extensions of credit or financial accommodations from the Senior Lender to the Borrowers, or to any other person under the guaranty or endorsement of the Borrowers.

The Subordinated Creditor has made or may make loans or grant other financial accommodations to Companies.

As a condition to Lender continuing to make loans and extensions of credit to the Borrowers, the Senior Lender has required that the Subordinated Creditor subordinate the payment of the Subordinated Creditor's loans and other financial accommodations to the payment of any and all indebtedness of Companies to the Senior Lender. Assisting the Companies in obtaining credit accommodations from the Senior Lender and subordinating its interests pursuant to the terms of this Agreement are in the Subordinated Creditor's best interest.

ACCORDINGLY, in consideration of the loans and other financial accommodations that have been made and may hereafter be made by the Senior Lender for the benefit of the Companies, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Subordinated Creditor hereby agrees as follows:

1.  <u>Definitions</u>. As used herein, the following terms have the meanings set forth below:

    "Acquisition Agreement" means the Stock Purchase Agreement dated as of March 1, 2006 among Argo, Subordinated Creditor and D&D as amended, modified and supplemented from time to time.

    "Annual Earn-Out Payment" has the meaning given to such term in the Acquisition Agreement as in effect on the date of this Agreement.

    "Argo Guaranty" means the Guaranty executed by Argo in favor of Subordinated Creditor, as the same may be amended, supplemented or restated from time to time.

NY468952.4
20391310030
03/14/2006 lh

"Borrower Default" means a Default or Event of Default as defined in any agreement or instrument evidencing, governing, or issued in connection with Senior Lender Indebtedness, including, but not limited to, the Credit Agreement, or any default under or breach of any such agreement or instrument.

"Collateral" means all collateral now or hereafter securing payment of the Senior Lender Indebtedness, including all proceeds thereof.

"Credit Agreement" means that certain Amended and Restated Credit and Security Agreement dated as of March 3, 2006, by and among the Companies and the Senior Lender, as the same may hereafter be amended, supplemented or restated from time to time.

"End of Term Earn-Out Payment" has the meaning given to such term in the Acquisition Agreement as in effect on the date of this Agreement.

"Enforcement Conditions" means the satisfaction of each of the following conditions: (a) a Subordinated Payment Default shall have occurred and be continuing; (b) Subordinated Creditor has notified the Senior Lender in writing of the occurrence of such Subordinated Payment Default and 365 days have elapsed since the date of such notice and such Payment Default shall still be continuing; (c) no Company shall have commenced or had commenced against it any case, proceeding or any action under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors; (d) no Borrower Default has occurred and is continuing; (e) Subordinated Creditor shall have been given at least five (5) business days prior written notice of Subordinated Creditor's intention to take such action.

"Flip Fee" has the meaning given to such term in the Acquisition Agreement as in effect on the date of this Agreement.

"Guaranty" means the Guaranty executed by ATC in favor of the Senior Lender, as the same may hereafter be amended, supplemented, or restated from time to time.

"Lien" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or hereafter acquired and whether arising by agreement or operation of law.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Senior Lender Indebtedness" means each and every debt, liability and obligation of every type and description, including, without limitation, under the Credit Agreement and the Guaranty, which any Company may now or at any time hereafter owe to the

Senior Lender, whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several or joint and several, all interest thereon, and all fees, costs and other charges related thereto (including all interest, fees, costs and other charges accruing after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of any Company, whether or not allowed in such proceeding or other action, and whether or not Senior Lender is deemed to be unsecured or under-secured), all renewals, extensions and modifications thereof and any notes issued in whole or partial substitution therefor.

"Subordinated Indebtedness" means all obligations arising under the Subordinated Note, the Acquisition Agreement, the Argo Guaranty and each and every other debt, liability and obligation of every type and description which any Company may now or at any time hereafter owe to the Subordinated Creditor, whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several or joint and several.

"Subordinated Note" means the Promissory Note, dated as of March __, 2006, made by ATC and payable to the order of the Subordinated Creditor in the original principal amount of $5,000,000, together with all renewals, extensions and modifications thereof and any note or notes issued in substitution therefor.

"Subordinated Payment Default" means a default in the payment of amounts due and owing with respect to the Subordinated Indebtedness.

"Working Capital Excess" has the meaning given to such term in the Acquisition Agreement as in effect on the date of this Agreement.

"Working Capital Shortfall" has the meaning given to such term in the Acquisition Agreement as in effect on the date of this Agreement.

2. <u>Subordination</u>. The payment of all of the Subordinated Indebtedness is hereby expressly subordinated to the extent and in the manner hereinafter set forth to the payment in full of the Senior Lender Indebtedness; and regardless of any priority otherwise available to the Subordinated Creditor by law or by agreement, the Senior Lender shall hold a first priority Lien in the Collateral, and any Lien claimed therein by the Subordinated Creditor shall be and remain fully subordinate for all purposes to the Lien of the Senior Lender therein for all purposes whatsoever. The Subordinated Indebtedness shall continue to be subordinated to the Senior Lender Indebtedness even if the Senior Lender Indebtedness is deemed unsecured, under-secured, subordinated, avoided or disallowed under the United States Bankruptcy Code or other applicable law.

3. <u>Payments</u>. Until all of the Senior Lender Indebtedness has been paid in full and the Senior Lender has released its Lien in the Collateral, the Subordinated Creditor shall not, without the Senior Lender's prior written consent, demand, receive or accept any payment

(whether of principal, interest or otherwise) from any Borrower in respect of the Subordinated Indebtedness, or exercise any right of or permit any setoff in respect of the Subordinated Indebtedness, except that (i) the Subordinated Creditor may reduce the Subordinated Note by the amount of the Working Capital Shortfall, (ii) the Subordinated Creditor may accept scheduled payments (but not prepayments) of principal and interest required to be paid under the Subordinated Note, so long as no Borrower Default has occurred and is continuing or will occur as a result of or immediately following any such payment and (iii) the Subordinated Creditor may accept payments with respect to the Working Capital Excess, the Annual Earn-Out Payment or the End of Term Earn-Out Payment, so long as no Borrower Default has occurred and is continuing or will occur as a result of or immediately following any such payment.

4. Receipt of Prohibited Payments. If the Subordinated Creditor receives any payment on the Subordinated Indebtedness that the Subordinated Creditor is not entitled to receive under the provisions of this Agreement, the Subordinated Creditor will hold the amount so received in trust for the Senior Lender and will forthwith turn over such payment to the Senior Lender in the form received (except for the endorsement of the Subordinated Creditor where necessary) for application to then-existing Senior Lender Indebtedness (whether or not due), in such manner of application as the Senior Lender may deem appropriate. If the Subordinated Creditor exercises any right of setoff which the Subordinated Creditor is not permitted to exercise under the provisions of this Agreement, the Subordinated Creditor will promptly pay over to the Senior Lender, in immediately available funds, an amount equal to the amount of the claims or obligations offset. If the Subordinated Creditor fails to make any endorsement required under this Agreement, the Senior Lender, or any of its officers or employees or agents on behalf of the Senior Lender, is hereby irrevocably appointed as the attorney-in-fact (which appointment is coupled with an interest) for the Subordinated Creditor to make such endorsement in the Subordinated Creditor's name.

5. Action on Subordinated Indebtedness. The Subordinated Creditor will not commence any action or proceeding against any Company to recover all or any part of the Subordinated Indebtedness, or join with any creditor (unless the Senior Lender shall so join) in bringing any proceeding against any Company under any bankruptcy, reorganization, readjustment of debt, arrangement of debt receivership, liquidation or insolvency law or statute of the federal or any state government, or take possession of, sell, or dispose of any Collateral, or exercise or enforce any right or remedy available to the Subordinated Creditor with respect to any such Collateral, unless and until the Senior Lender Indebtedness has been paid in full and the Senior Lender has released its Lien in the Collateral; provided, however, if the Enforcement Conditions have been satisfied the Subordinated Creditor may commence an action or proceeding to recover any amounts due or to become due with respect to the Subordinated Indebtedness but may not take any action to enforce any judgment or Lien arising as a result thereof.

6. Action Concerning Collateral.

(a) Notwithstanding any Lien now held or hereafter acquired by the Subordinated Creditor, the Senior Lender may take possession of, sell, dispose of, and otherwise deal with all or any part of the Collateral, and may enforce any right or remedy

available to it with respect to any Company or the Collateral, all without notice to or consent of the Subordinated Creditor, except as specifically required by applicable law.

(b) In addition, and without limiting the generality of the foregoing, if (i) a Borrower Default has occurred and is continuing, (ii) any Company or the Lender intends to sell or otherwise dispose of any Collateral to an unrelated third party outside the ordinary course of business, (iii) Senior Lender has given written notice thereof to the Subordinated Creditor, and (iv) the Subordinated Creditor has failed, within ten (10) days after receipt of such notice, to purchase for cash the Senior Lender Indebtedness for the full amount thereof, the Subordinated Creditor shall be deemed to have consented to such sale or disposition, to have released any Lien it may have in such Collateral and to have authorized the Senior Lender or its agents to file partial releases (and any related financing statements such as "in lieu" financing statements under Part 7 of Article 9 of the Uniform Commercial Code) with respect to such Collateral.

(c) The Senior Lender shall have no duty to preserve, protect, care for, insure, take possession of, collect, dispose of, or otherwise realize upon any of the Collateral, and in no event shall the Senior Lender be deemed the Subordinated Creditor's agent with respect to the Collateral. All proceeds received by the Senior Lender with respect to any Collateral may be applied, first, to pay or reimburse the Senior Lender for all costs and expenses (including reasonable attorneys' fees) incurred by the Senior Lender in connection with the collection of such proceeds, and, second, to any Senior Lender Indebtedness secured by the Senior Lender's Lien in that Collateral in any order that it may choose.

7. <u>Bankruptcy and Insolvency</u>. In the event of any receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization or arrangement with creditors, whether or not pursuant to bankruptcy law, the sale of all or substantially all of the assets of any Company, dissolution, liquidation or any other marshalling of the assets or liabilities of any Company, the Subordinated Creditor will file all claims, proofs of claim or other instruments of similar character necessary to enforce the obligations of such Company in respect of the Subordinated Indebtedness and will hold in trust for the Senior Lender and promptly pay over to the Senior Lender in the form received (except for the endorsement of the Subordinated Creditor where necessary) for application to the then-existing Senior Lender Indebtedness, any and all moneys, dividends or other assets received in any such proceedings on account of the Subordinated Indebtedness, unless and until the Senior Lender Indebtedness has been paid in full and the Senior Lender's Lien in the Collateral has been terminated. If the Subordinated Creditor shall fail to take any such action, the Senior Lender, as attorney-in-fact for the Subordinated Creditor, may take such action on the Subordinated Creditor's behalf. The Subordinated Creditor hereby irrevocably appoints the Senior Lender, or any of its officers or employees on behalf of the Senior Lender, as the attorney-in-fact for the Subordinated Creditor (which appointment is coupled with an interest) with the power but not the duty to demand, sue for, collect and receive any and all such moneys, dividends or other assets and give acquittance therefor and to file any claim, proof of claim or other instrument of similar character, to vote claims comprising Subordinated Indebtedness to accept or reject any plan of partial or complete liquidation, reorganization, arrangement, composition or extension and to take such other action in the Senior Lender's own name or in the name of the Subordinated Creditor as the Senior Lender may deem

necessary or advisable for the enforcement of the agreements contained herein; and the Subordinated Creditor will execute and deliver to the Senior Lender such other and further powers-of-attorney or instruments as the Senior Lender may request in order to accomplish the foregoing. If the Senior Lender desires to permit the use of cash collateral or to provide post-petition financing to any Company, the Subordinated Creditor shall not object to the same or assert that its interests are not being adequately protected.

8. <u>Restrictive Legend; Transfer of Subordinated Indebtedness</u>. The Subordinated Creditor will cause the Subordinated Note and all other notes, bonds, debentures or other instruments evidencing the Subordinated Indebtedness or any part thereof to contain a specific statement thereon to the effect that the indebtedness thereby evidenced is subject to the provisions of this Agreement, and the Subordinated Creditor will mark its books conspicuously to evidence the subordination effected hereby. Attached hereto is a true and correct copy of the Subordinated Note bearing such legend. At the request of the Senior Lender, the Subordinated Creditor shall deposit with the Senior Lender the Subordinated Note and all of the other notes, bonds, debentures or other instruments evidencing the Subordinated Indebtedness, which notes, bonds, debentures or other instruments may be held by the Senior Lender so long as any Senior Lender Indebtedness remains outstanding or the Senior Lender's Lien in the Collateral has not been terminated. The Subordinated Creditor is the lawful holder of the Subordinated Indebtedness and has not transferred any interest therein to any other person or entity. Without the prior written consent of the Senior Lender, the Subordinated Creditor will not assign, transfer or pledge to any other person any of the Subordinated Indebtedness or agree to a discharge or forgiveness of the same.

9. <u>Continuing Effect</u>. This Agreement shall constitute a continuing agreement of subordination, and the Senior Lender may, without notice to or consent by the Subordinated Creditor, modify any term of the Senior Lender Indebtedness in reliance upon this Agreement. Without limiting the generality of the foregoing, the Senior Lender may, at any time and from time to time, without the consent of or notice to the Subordinated Creditor and without incurring responsibility to the Subordinated Creditor or impairing or releasing any of the Senior Lender's rights or any of the Subordinated Creditor's obligations hereunder:

(a) change the interest rate or change the amount of payment or extend the time for payment or renew or otherwise alter the terms of any Senior Lender Indebtedness or any instrument evidencing the same in any manner;

(b) sell, exchange, release or otherwise deal with any property at any time securing payment of the Senior Lender Indebtedness or any part thereof;

(c) release anyone liable in any manner for the payment or collection of the Senior Lender Indebtedness or any part thereof;

(d) exercise or refrain from exercising any right against any Company or any other person (including the Subordinated Creditor); and

(e) apply any sums received by the Senior Lender, by whomsoever paid and however realized, to the Senior Lender Indebtedness in such manner as the Senior Lender shall deem appropriate.

10. <u>No Commitment</u>. None of the provisions of this Agreement shall be deemed or construed to constitute or imply any commitment or obligation on the part of the Senior Lender to make any future loans or other extensions of credit or financial accommodations to any Company.

The Subordinated Creditor hereby waives any and all right to require the marshalling of assets in connection with the exercise of any of the Senior Lender's remedies permitted by applicable law or agreement.

11. <u>Notice</u>. All notices and other communications hereunder shall be in writing and shall be (i) personally delivered, (ii) transmitted by registered mail, postage prepaid, or (iii) transmitted by telecopy, in each case addressed to the party to whom notice is being given at its address as set forth below:

If to the Senior Lender:

Wells Fargo Business Credit
119 West 40th Street
New York, New York
Telecopier: 646-728-3279
Attention: Account Manager – Argo Turboserve Corporation

If to the Subordinated Creditor:
100 Blue Ridge Drive
Carencro, Louisiana 70520
Attention: Dean Angelle and Denise Angelle
Telecopier: (337) 896-1930

or at such other address as may hereafter be designated in writing by that party. All such notices or other communications shall be deemed to have been given on (i) the date received if delivered personally, (ii) the date of posting if delivered by mail, or (iii) the date of transmission if delivered by telecopy.

12. <u>Conflict in Agreements</u>. If the subordination provisions of any instrument evidencing Subordinated Indebtedness conflict with the terms of this Agreement, the terms of this Agreement shall govern the relationship between the Senior Lender and the Subordinated Creditor.

13. <u>No Waiver</u>. No waiver shall be deemed to be made by the Senior Lender of any of its rights hereunder unless the same shall be in writing signed on behalf of the Senior Lender, and each such waiver, if any, shall be a waiver only with respect to the specific matter or matters to which the waiver relates and shall in no way impair the rights of the Senior Lender or

the obligations of the Subordinated Creditor to the Senior Lender in any other respect at any time.

14. <u>Binding Effect; Acceptance</u>. This Agreement shall be binding upon the Subordinated Creditor and the Subordinated Creditor's heirs, legal representatives, successors and assigns and shall inure to the benefit of the Senior Lender and its participants, successors and assigns irrespective of whether this or any similar agreement is executed by any other creditor of any Company. Notice of acceptance by the Senior Lender of this Agreement or of reliance by the Senior Lender upon this Agreement is hereby waived by the Subordinated Creditor.

15. <u>Miscellaneous</u>. The paragraph headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

16. <u>Governing Law; Consent to Jurisdiction and Venue; Waiver of Jury Trial</u>. This Agreement shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of New York. Each party consents to the personal jurisdiction of the state and federal courts located in the State of New York in connection with any controversy related to this Agreement, waives any argument that venue in any such forum is not convenient, and agrees that any litigation initiated by any of them in connection with this Agreement may be venued in either the state or federal courts located in New York County, New York. **THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT.**

IN WITNESS WHEREOF, the Subordinated Creditor has executed this Agreement as of the date and year first above-written.

_____
Dean Angelle

_____
Denise Angelle

### Acknowledgment by Companies

Each of the undersigned, being the Companies referred to in the foregoing Agreement, hereby (i) acknowledges receipt of a copy thereof, (ii) agrees to all of the terms and provisions thereof, (iii) agrees to and with the Senior Lender that it shall make no payment on the Subordinated Indebtedness that the Subordinated Creditor would not be entitled to receive under the provisions of the foregoing Agreement, (iv) agrees that any such payment will constitute a default under the Senior Lender Indebtedness, and (v) agrees to mark its books conspicuously to evidence the subordination of the Subordinated Indebtedness effected hereby.

ARGO TURBOSERVE CORPORATION

By _____
    Name:
    Title:


D&D PIPE AND RENTALS, INC.

By _____
    Name:
    Title:


ATC ENERGY SERVICES, LLC

By _____
    Name:
    Title:

IN WITNESS WHEREOF, the Subordinated Creditor has executed this Agreement as of the date and year first above-written.

_____
Dean Angelle

_____
Denise Angelle

Acknowledgment by Companies

Each of the undersigned, being the Companies referred to in the foregoing Agreement, hereby (i) acknowledges receipt of a copy thereof, (ii) agrees to all of the terms and provisions thereof, (iii) agrees to and with the Senior Lender that it shall make no payment on the Subordinated Indebtedness that the Subordinated Creditor would not be entitled to receive under the provisions of the foregoing Agreement, (iv) agrees that any such payment will constitute a default under the Senior Lender Indebtedness, and (v) agrees to mark its books conspicuously to evidence the subordination of the Subordinated Indebtedness effected hereby.

ARGO TURBOSERVE CORPORATION

By _____
Name: PAUL PERIALAS
Title: CFO


D&D PIPE AND RENTALS, INC.

By _____
Name: PAUL PERIALAS
Title: CFO


ATC ENERGY SERVICES, LLC

By _____
Name:
Title:

IN WITNESS WHEREOF, the Subordinated Creditor has executed this Agreement as of the date and year first above-written.

_____
Dean Angelle

_____
Denise Angelle

<u>Acknowledgment by Companies</u>

Each of the undersigned, being the Companies referred to in the foregoing Agreement, hereby (i) acknowledges receipt of a copy thereof, (ii) agrees to all of the terms and provisions thereof, (iii) agrees to and with the Senior Lender that it shall make no payment on the Subordinated Indebtedness that the Subordinated Creditor would not be entitled to receive under the provisions of the foregoing Agreement, (iv) agrees that any such payment will constitute a default under the Senior Lender Indebtedness, and (v) agrees to mark its books conspicuously to evidence the subordination of the Subordinated Indebtedness effected hereby.

ARGO TURBOSERVE CORPORATION

By _____
   Name:
   Title:


D&D PIPE AND RENTALS, INC.

By _____
   Name:
   Title:


ATC ENERGY SERVICES, LLC

By _____[signature]_____
   Name: WALTER A. SIMSON III
   Title: Pres