*Execution Copy*

## EXECUTIVE EMPLOYMENT AGREEMENT

This Executive Employment Agreement ("*Agreement*") is entered into by and between D&D Pipe and Rentals, a Louisiana corporation ("*Company*") and a wholly owned subsidiary and division of Argo Turboserve Corporation, a Delaware corporation, having offices at 49 Commerce Road, Carlstadt, New Jersey (the "*ATC*") and Dean Angelle, an individual currently residing at _____ ("*Executive*"), as of March 3, 2006. The term "*Party*" or "*Parties*" means the Company or Executive, or both, as the case may be.

### W I T N E S S E T H:

WHEREAS, the Company, Executive, Denise Angelle, and ATC have entered into a stock purchase agreement pursuant to which the Company is purchasing one hundred percent (100%) of the D&D Pipe stock ("*Stock Purchase Agreement*") and such transaction shall be completed on the Closing Date (as such term is defined in the Stock Purchase Agreement);

WHEREAS, the Company desires to employ the Executive on and after the Closing Date pursuant to the terms and conditions and for the consideration set forth in this Agreement, and Executive desires to become an employee of the Company, pursuant to such terms and conditions and for such consideration.

NOW, THEREFORE, for and in consideration of the mutual promises, covenants, and obligations contained herein, the Company and the Executive hereby agree as follows:

### ARTICLE I: EMPLOYMENT, DUTIES AND REPRESENTATIONS

1.1. <u>Term of Employment</u>. Subject to the terms and conditions of this Agreement, the Company agrees to employ Executive, and Executive agrees to be employed by the Company, beginning on the Closing Date and continuing until the date that is five (5) years after the Closing Date, or until otherwise terminated earlier pursuant to the terms of this Agreement (the "*Term*"). If at the end of the Term the Parities desire to enter into negotiations for further employment, Executive shall be an at-will employee until the Parties enter into a new employment agreement.

1.2. <u>Position and Duties.</u>

(A) Beginning on the Closing Date, Executive shall be employed as an executive of the Company to lead a newly formed, separate and distinct division of the ATC dedicated to the business of selling and refurbishing pipe for oil and gas application (the "*Business*") and maximizing the business opportunities related to the technology and assets transferred under the Stock Purchase Agreement (the "*Division*"). Executive's duties include, but are not limited to, using the Executive's best efforts to: (i) transition the technology and assets purchased by ATC pursuant to the Stock Purchase Agreement to the Company and seek patents for the Company (or such other appropriate intellectual property protection) for any such technology and for any technology developed by Executive after the Closing Date; (ii) provide

EXHIBIT "6"

leadership to the employees of the Division; and (iii) expand the business opportunities of the Division, including, but not limited to, using his reasonable best efforts to increase revenues and earnings of the Division. The Executive agrees to serve in the assigned position and to perform diligently and to the best of Executive's abilities the duties and services appertaining to such position as reasonably determined by the Company, as well as such additional or different duties and services appropriate to such position which the Executive from time to time may be reasonably directed to perform by the Company. Executive shall at all times comply with and be subject to such policies and procedures as the Company may establish from time to time, including, without limitation, the Company's Program and Practices Manual. Executive acknowledges that he has received a copy of the Company's Program and Practices Manual and has reviewed and is familiar with the contents of such manual.

(B)     During the Term, Executive shall report to Clyde Keaton, or his designee or successor, as the case may be. Directions from such senior executive shall be considered as directions from the Company for purposes of this Agreement.

(C)     The Executive shall, during the period of Executive's employment by the Company, devote his full business time, energy, and best efforts to the business and affairs of the Company. Executive, in addition to complying with the requirements contained in Article 5, may not engage, directly or indirectly, without the Company's prior written consent, in any other business, investment, or activity that interferes with Executive's performance of Executive's duties hereunder, is contrary to the interest of, or competes with, the Company or its Affiliates, or requires any significant portion of Executive's business time.

1.3.     Representations of Executive. Executive represents that:

(A)     He (i) is familiar with the covenants not to compete and not to solicit set forth in this Agreement, (ii) is fully aware of his obligations hereunder, including, without limitation, the length of time, scope and geographic coverage of these covenants, (iii) finds the length of time, scope and geographic coverage of these covenants to be reasonable, and (iv) is receiving separate, specific, bargained-for consideration for his covenants not to compete and not to solicit during the Term, and for the period subsequent to the Term.

(B)     The execution of this Agreement and the performance of Executive's obligations hereunder, will not conflict with, or result in a violation or breach of, any other agreement to which Executive is a party or any judgment, order or decree to which Executive is subject.

(C)     Executive acknowledges and agrees that Executive, while employed by the Company, owes a fiduciary duty of loyalty, fidelity and allegiance to act at all times in the best interest of the Company, and to do no act which would intentionally injure the Company's business, interests, or reputation. In keeping with Executive's fiduciary duties owed to the Company, Executive agrees that Executive shall not knowingly become involved in a conflict of interest with the Company or its Affiliates, or upon discovery thereof, allow such a conflict to continue. Moreover, Executive agrees that he has a continuing obligation during the Term of this Agreement to disclose to Clyde Keaton, or his designee or successor, as the case may be, any

facts which might involve a possible conflict of interest. The term *"Affiliate"* as used in this Agreement means, with respect to either Party, any individual or entity that directly or indirectly controls, is controlled by or is under common control with that Party. As used in this definition, *"control"* means either (i) the ownership of greater than 50% of an entity's voting securities, or (ii) the ability, through contract or otherwise, to determine an entity's operating activities.

## ARTICLE 2: COMPENSATION AND BENEFITS

2.1.    Base Salary. Executive's base salary during the Term shall be Two Hundred Fifty Thousand Dollars ($250,000) per annum which shall be paid by Company to Executive in semi-monthly payments (the *"Base Salary"*). Unless otherwise mutually agreed to by the Parties, the Base Salary shall not be reduced during the Term of this Agreement. Any and all decisions regarding increases to Base Salary will be made at the sole discretion of the Company.

2.2.    Expenses. Commencing on the Closing Date, the Company shall pay for, or reimburse, Executive's ordinary, reasonable and necessary business expenses, consistent with expenses incurred by executives performing similar duties, which Executive incurs in performing his duties under this Agreement including, but not limited to, travel, entertainment, professional dues and subscriptions, and all dues, fees and expenses associated with membership in various professional, business and civic associations and societies of which Executive's participation is in the best interest of the Company. In order to receive reimbursement from the Company for such expenses, Executive must comply with established Company reimbursement procedures.

2.3.    Vehicle Allowance. The Company will provide Executive with a vehicle suitable for business use, up to a maximum total value of Thirty-Five Thousand Dollars ($35,000). The Company will assume responsibility for all such vehicle operating expenses, except for: (i) tolls, and (ii) a payment to be made by Executive to the Company to reimburse the Company for Executive's personal use. The Company will deduct on a semi-monthly basis from the Executive's Base Salary Eighty-Two and One Half Dollars ($82.50) to reimburse the Company for the Executive's personal use of the automobile. The Company has the right to periodically review and adjust such payment for Executive's personal use of the vehicle.

2.4.    Benefit Plans. While employed by the Company, Executive shall be allowed to participate, on the same basis generally as other employees of the Company, in all general employee benefit plans and programs that exist from time to time, including improvements or modifications of the same, which on the Closing Date or thereafter are made available by the Company to all or substantially all of the Company's employees. Such benefits, plans, and programs may include, without limitation, medical, health, and dental care, life insurance, disability protection, and qualified retirement plans, but shall not include any incentive compensation or bonus plans or programs. Nothing in this Agreement is to be construed or interpreted to provide greater rights, participation, coverage, or benefits under such benefit plans or programs than provided to employees pursuant to the terms and conditions of such benefit plans and programs. The Executive acknowledges and agrees that the costs of any and all employee benefit plans in which the Executive elects to participate in will be deducted from Executive's Base Salary on the same basis generally as other employees of the Company. The Company shall provide the Executive with three (3) weeks of paid vacation annually.

3

2.5.    The Company shall not by reason of this Article 2 be obligated to institute, maintain, or refrain from changing, amending, or discontinuing, any employee benefit program or plan, so long as such actions are similarly applicable to covered employees generally.

2.6.    Taxes.    The Company may withhold from the Base Salary, any other compensation, benefits, or amounts payable under this Agreement all federal, state, city, or other taxes as may be required pursuant to any law or governmental regulation or ruling.

## ARTICLE 3: TERMINATION PRIOR TO EXPIRATION OF TERM AND EFFECTS OF SUCH TERMINATION

3.1.    Termination.    Executive's employment with the Company shall be terminated:

    i.    upon the death of Executive;

    ii.    upon Executive's permanent disability, which means solely for the purpose of defining termination under this Agreement and not for the purpose of defining or determining disability rights under the Company's disability benefits policy, Executive's physical or mental incapacity to perform the essential functions of his job for a period of at least 12 weeks, with such condition likely to remain continuously and permanently ("*Permanent Disability*");

    iii.    at any time during the Term, in the sole discretion of, and at the election of the Executive, (1) if the Company violates a material law related to Executive's employment or this Agreement, such violation materially interferes with Executive's ability to carry out his obligations under this Agreement, and such violation remains uncorrected for thirty (30) days following written notice of such breach to the Company by the Executive, or (2) if there is a material breach by the Company of any material provision of this Agreement which remains uncorrected for thirty (30) days following written notice of such breach to the Company by the Executive (each, a "*Company Cause*");

    iv.    upon thirty (30) days' notice by Company to Executive, at any time during the Term, in the sole discretion of, and at the election of the Company, for any reason whatsoever, other than for a termination for Company Cause ("*Company Voluntary Termination*");

    v.    upon any one of the following events: (1) Executive's gross negligence in the performance of the duties and services required of the Executive pursuant to this Agreement that has a material adverse effect on the Company or any Affiliate, (2) Executive's final

4

conviction of a felony, (3) it is found that a material representation or warranty made by the Executive in this Agreement or in the Stock Purchase Agreement was known to Executive to be untrue at the time such representation or warranty was made, (4) Executive breaches a covenant or promise made in the Stock Purchase Agreement, and such breach remains uncorrected for thirty (30) days following written notice of such breach to Executive by the Company, (5) Executive materially violates the Company's Program and Practices Manual, and such violation remains uncorrected for thirty (30) days following written notice of such violation to Executive by the Company, or (6) Executive does not materially comply with any provision of this Agreement, and such non-compliance remains uncorrected for thirty (30) days following written notice of such non-compliance to Executive by the Company ("*Executive Cause*"); or

vi.    upon thirty (30) days' notice by Executive to the Company, at any time during the Term, in the sole discretion of, and at the election of the Executive, any reason whatsoever, other than for a termination for Executive Cause ("*Executive Voluntary Termination*").

3.2.    Effects of Termination.

(A)    If Executive's employment is terminated due to (i) death, (ii) Permanent Disability, (iii) Executive Cause, or (iv) Executive Voluntary Termination, all future compensation to which Executive is otherwise entitled to and all future benefits for which Executive is eligible shall cease and terminate as of the date of termination, except as specifically provided in this Section 3.2(A). Benefits payable to Executive pursuant to the plans, programs or agreements specified or referred to in Sections 2.2, 2.3, or 2.4 shall be made in accordance with such plans, programs, agreements and the provisions of such Sections. Executive, or his estate in the case of Executive's death, shall be entitled to *pro rata* Base Salary through the date of such termination. For purposes of this Section 3.2, the *pro rata* Base Salary shall be paid in accordance with the terms of this Agreement. The Executive shall not be entitled to any other payments by or on behalf of the Company except for those which may be payable pursuant to the terms of the Company's employee benefit plans.

(B)    If Executive's employment is terminated by reason of (i) Company Cause, or (ii) Company Voluntary Termination, Executive's Base Salary shall continue pursuant to the terms of Section 2.1 until the date that is five (5) years after the Closing Date, however, all other all future benefits for which Executive is eligible shall cease and terminate as of the date of such termination. Benefits accrued prior to termination and payable to Executive pursuant to the plans, programs or agreements specified or referred to in Sections 2.2, 2.3, or 2.4 shall be made in accordance with such plans, programs, agreements and the provisions of such Sections. The Executive shall not be entitled to any other payments by or on behalf of the Company except for those which may be payable pursuant to the terms of the Company's employee benefit plans or pursuant to the terms of this Agreement.

(C)    Termination of the employment relationship does not terminate those obligations imposed by this Agreement which are continuing obligations, including, without limitation, Executive's obligations under Articles 4 and 5.

## ARTICLE 4: OWNERSHIP AND PROTECTION OF INTELLECTUAL PROPERTY AND CONFIDENTIAL INFORMATION

4.1.    All information, ideas, concepts, improvements, discoveries, and inventions, whether patentable or not, which are conceived, made, developed or acquired by Executive, individually or in conjunction with others, during Executive's employment by the Company (whether during business hours or otherwise and whether on the Company's premises or otherwise) which relate to the Company's business, products or services (including, without limitation, all such information relating to corporate opportunities, research, financial and sales data, pricing and trading terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within the customer's organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names, and marks), and all writings or materials of any type embodying any of such items (collectively, *"Developments"*), shall be the sole and exclusive property of the Company.  Executive acknowledges that Developments are works made for hire and shall remain the sole and exclusive property of the Company.  The Executive hereby assigns to the Company, in consideration of the payments set forth in Section 2.1 hereof, all of his right, title and interest in and to all such Developments. The Executive shall promptly and fully disclose all future material Developments to Clyde Keaton, or his designee or successor, as the case may be, and at any time upon request and at the expense of the Company, shall execute, acknowledge and deliver to the Company all instruments that the Company shall prepare, give evidence and take all other actions that are necessary or desirable in the reasonable opinion of the Company to enable the Company to file and prosecute applications for and to acquire, maintain and enforce all letters patent and trademark registrations or copyrights covering the Developments in all countries in which the same are deemed necessary by the Company.  All memoranda, notes, lists, drawings, records, files, computer tapes, programs, software, source and programming narratives and other documentation (and all copies thereof) made or compiled by the Executive or made available to the Executive concerning the Developments or otherwise concerning the business of the Division or planned business of the Company or any of its subsidiaries or Affiliates shall be the property of the Company or such subsidiaries or Affiliates and shall be delivered to the Company or such subsidiaries or Affiliates promptly upon the expiration or termination of the Term.  The provisions of this Section 4.1 shall, without any limitation as to time, survive the expiration or termination of the Executive's employment hereunder, irrespective of the reason for any termination.

4.2.    Executive acknowledges that the businesses of the Company and its Affiliates are highly competitive and that their strategies, methods, books, records, and documents, their technical information concerning their products, equipment, services, and processes, procurement procedures and pricing techniques, the names of and other information (such as credit and financial data) concerning their customers and business affiliates, all comprise confidential business information and trade secrets which are valuable, special, and unique assets

6

which the Company or its Affiliates use in their business to obtain a competitive advantage over their competitors. Executive further acknowledges that protection of such confidential business information and trade secrets against unauthorized disclosure and use is of critical importance to the Company and its Affiliates in maintaining their competitive position. Executive hereby agrees that Executive will not, at any time during or after his employment by the Company, make any unauthorized disclosure of any confidential business information or trade secrets of the Company or its Affiliates, or make any use thereof, except in the carrying out of his employment responsibilities hereunder. Confidential business information shall not include information in the public domain (but only if the same becomes part of the public domain through a means other than a disclosure prohibited hereunder). The above notwithstanding, a disclosure shall not be unauthorized if (i) it is required by law or by a court of competent jurisdiction or (ii) it is in connection with any judicial or other legal proceeding in which Executive's legal rights and obligations as an employee or under this Agreement are at issue; provided, however, that Executive shall, to the extent practicable and lawful in any such events, give prior notice to the Company of his intent to disclose any such confidential business information in such context so as to allow the Company an opportunity (which Executive will not oppose) to obtain such protective orders or similar relief with respect thereto as it may deem appropriate.

4.3.    All written materials, records, and other documents made by, or coming into the possession of, Executive during the period of Executive's employment by the Company which contain or disclose confidential business information or trade secrets of the Company or its Affiliates shall be and remain the property of the Company, or its Affiliates, as the case may be. Upon termination of Executive's employment by the Company, for any reason, Executive promptly shall deliver the same, and all copies thereof, to the Company.

## ARTICLE 5: POST-EMPLOYMENT AND NON-COMPETITION OBLIGATIONS

5.1.    As part of the consideration for the compensation and benefits to be paid to Executive hereunder and the Stock Purchase Agreement, and as an additional incentive for the Company to enter into this Agreement, the Company and Executive agree to the non-competition provisions of this Article 5 during the Term of Executive's employment and for two (2) years after termination of employment or the expiration of this Agreement. Notwithstanding the previous sentence, in the case of a termination due to either Company Cause, or Company Voluntary Termination, the non-competition provisions of this Article 5 shall survive until seven (7) years after the Closing Date; provided, that, if after a termination due to Company Cause, or Company Voluntary Termination the Company at any time fails to pay Executive his Base Salary in accordance with the terms of this Agreement (and such failure is not cured within thirty (30) days after notice to Company by Executive of such failure), the non-competition provisions of this Article 5 shall survive until two (2) years after the date on which Executive received his final payment of the Base Salary. Executive shall not directly or indirectly: (i) engage anywhere in the world, in the Business, or (ii) the provision of any service substantially similar to or in competition with any service offered by the Company at any time during such period; (iii) be or become a stockholder, partner, owner, officer, director or employee or agent of, or a consultant to, or give financial or other assistance to, any person or entity considering engaging in any such activities or so engaged; (iv) seek in competition with the Business of the Company to procure orders from or do business with any customer of the Company; (v) solicit, or contact with a view

to the engagement or employment of, any person who is an employee of the Company; (vi) seek to contract with or engage (in such a way as to adversely affect or interfere with the business of the Company) any person or entity who has been contracted with or engaged to manufacture, assemble, supply or deliver products, goods, materials or services to the Company; or (vii) engage in, or participate in any effort to act to induce any of the customers, associates, consultants, and employees of the Company or any of its Affiliates to take, any action which might be disadvantageous to the Company or any of its Affiliates; provided, however, that nothing herein shall prohibit the Executive from owning, as a passive investor, stock of any corporation so engaged.  The duration of the Executive's covenants set forth in this Section 5.1 shall be extended by a period of time equal to the number of days, if any, during which the Executive is in violation of the provisions hereof.

The term "*Company*" as used in this Section 5.1 shall mean and include (i) the Company's subsidiaries and Affiliates and (ii) the Company's joint venture activities (including research and development) by the Company and its Affiliates.

5.2    (A)    Executive acknowledges and agrees that the covenants contained in Articles 4 and 5 hereof are fair and reasonable in light of the consideration paid hereunder, and that damages alone shall not be an adequate remedy for any breach by Executive of his covenants contained herein and accordingly expressly agrees that, in addition to any other remedies which the Company may have, the Company, on its own behalf and on behalf of any of its Affiliates, shall be entitled to injunctive relief in any court of competent jurisdiction for any breach or threatened breach of any such covenants by Executive.  Nothing contained herein shall prevent or delay the Company from seeking, in any court of competent jurisdiction, specific performance or other equitable remedies in the event of any breach or intent to breach by Executive of any of its obligations hereunder.

(B)    Notwithstanding the equitable relief available to the Company, the Executive, in the event of a breach of his covenants contained in Articles 4 and 5 hereof, understands and agrees that the uncertainties and delay inherent in the legal process would result in the continuing breach for some period of time, and therefore, continuing injury to the Company until and unless the Company can obtain such equitable relief.  Therefore, in addition to such equitable relief, the Company shall be entitled to seek monetary damages for any such period of breach until the termination of such breach, in an amount deemed reasonable to cover all actual losses, plus all monies received by the Executive as a result of said breach.  If Executive should use or reveal to any other person or entity any confidential information, this will be considered a continuing violation on a daily basis for so long a period of time as such confidential information is made use of by Executive or any such other person or entity.

(C)    Notwithstanding the foregoing, Executive shall not be subject to the non-compete provisions of this Article 5 if (i) it is found by a court of competent jurisdiction in a final judgment, that the Company has improperly failed to pay Executive amounts due to Executive by the Company pursuant to this Agreement, and (ii) the Company fails to pay Executive such amount contained in such judgment by the date ordered by such court.

8

5.3.    It is expressly understood and agreed that the Company and Executive consider the restrictions contained in this Article 5 to be reasonable and necessary to protect the proprietary information and/or goodwill of the Company. Nevertheless, if any of the aforesaid restrictions are found by a court having jurisdiction to be unreasonable or overly broad as to geographic area or time, or otherwise unenforceable, the parties intend for the restrictions herein set forth to be modified by such courts so as to be reasonable and enforceable and, as so modified to be fully enforced.

## ARTICLE 7: MISCELLANEOUS

7.1.    Notices.    For purposes of this Agreement, notices and all other communications provided for herein shall be in writing and shall be deemed to have been duly given when received by or tendered to Executive or the Company, as applicable, by pre-paid courier or by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

> If to the Company, to the corporate headquarters to the attention of Clyde Keaton, or his successor, of the Company.
>
> If to Executive, to his last known personal residence.

7.2.    Governing Law. In all respects, including all matters of construction, validity and performance, this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York applicable to contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws. Any action to enforce any of the provisions of this Agreement shall be brought in a court of the State of New York located in the Borough of Manhattan of the City of New York, or in a Federal court located within the Southern District of New York. The parties consent to the jurisdiction of such courts and to the service of process in any manner provided by New York law. Each party irrevocably waives any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such court and any claim that such suit, action or proceeding brought in such court has been brought in an inconvenient forum and agrees that service of process in accordance with the foregoing sentences shall be deemed in every respect effective and valid personal service of process upon such party.

7.3.    Waiver. No failure by either Party hereto at any time to give notice of any breach by the other Party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time.

7.4.    Attorney's Fees. In the event that there is any controversy or claim arising out of or relating to this Agreement, or to the interpretation, breach or enforcement thereof, and any action or proceeding is commenced to enforce the provisions of this Agreement, the prevailing Party shall be entitled to a reasonable attorney's fee, costs and expenses.

7.5.    <u>Severability</u>. It is a desire and intent of the parties that the terms, provisions, covenants, and remedies contained in this Agreement shall be enforceable to the fullest extent permitted by law. If any such term, provision, covenant, or remedy of this Agreement or the application thereof to any person, association, or entity or circumstances shall, to any extent, be construed to be invalid or unenforceable in whole or in part, then such term, provision, covenant, or remedy shall be construed in a manner so as to permit its enforceability under the applicable law to the fullest extent permitted by law. In any case, the remaining provisions of this Agreement or the application thereof to any person, association, or entity or circumstances other than those to which they have been held invalid or unenforceable, shall remain in full force and effect.

7.6.    <u>Binding Nature of this Agreement; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Company, Executive and any other person, association, or entity which may hereafter acquire or succeed to all or substantially all of the business or assets of the Company by any means whether direct or indirect, by purchase, merger, consolidation, or otherwise. Executive's rights and obligations under this Agreement are personal and such rights, benefits, and obligations of Executive shall not be voluntarily or involuntarily assigned, alienated, or transferred, whether by operation of law or otherwise, without the prior written consent of the Company, other than in the case of death or incompetence of Executive.

7.7.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties with regard to such subject matter, and contains all of the covenants, promises, representations, warranties, and agreements between the parties with respect such subject matter. Each Party to this Agreement acknowledges that no representation, inducement, promise, or agreement, oral or written, has been made by either Party with respect to such subject matter, which is not embodied herein, and that no agreement, statement, or promise relating to the employment of Executive by the Company that is not contained in this Agreement shall be valid or binding. Any modification of this Agreement will be effective only if it is in writing and signed by each Party whose rights hereunder are affected thereby, provided that any such modification must be authorized or approved by the Company.

7.8.    <u>Representation</u>. This Agreement is the result of negotiations between Parties, each of whom was represented or had the opportunity to be represented in the transaction, and has had the opportunity to have had the transactional documents reviewed by counsel of their own choice.

7.9    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof shall bear the signatures of all of the Parties indicated as the signatories hereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Company and the Executive have duly executed this Agreement in multiple originals to be effective on the date which is first written above.

COMPANY

D&D PIPE AND RENTALS

By: _____

Name:     Clyde Keaton

Title:     Chairman of the Board

EXECUTIVE

By: _____

Name:     Dean Angelle

IN WITNESS WHEREOF, the Company and the Executive have duly executed this Agreement in multiple originals to be effective on the date which is first written above.

**COMPANY**

**D&D PIPE AND RENTALS**

By: _____
Name:      Clyde Keaton
Title:      Chairman of the Board

**EXECUTIVE**

By: _____
Name:      Dean Angelle