*Execution Copy*

Sellers and the Company covenant that from the date of this Agreement (unless a different date is indicated) through and including the Closing Date:

4.1    Buyer's Access To Premises And Information.  Buyer, its counsel, its accountants and other representatives shall have full access during normal business hours to all properties, accounts, records, contracts and documents of or relating to the Company's business or as may be necessary to determine the accuracy of Sellers' representations and warranties.  The Company shall furnish or cause to be furnished to Buyer and its representatives all data and information concerning the business, finances and properties of the Company as Buyer shall reasonably request.  The Company shall provide Buyer with copies of all of its Contract Documents, trademarks and trade name registrations, patents and patent applications, within fifteen (15) days of the date hereof.

4.2    Conduct of Business In Normal Course.  The Company will carry on its business and activities diligently and in substantially the same manner as previously had been carried out and shall not make or institute any unusual or novel business practice which varies from the methods used by the Company as of the date hereof.  Except as identified on the Disclosure Schedule, the Company shall not pay any dividend or other distribution with respect to its stock nor any compensation, bonus or other consideration to its shareholders or employees other than salaries and benefits which are in effect as of January 31, 2006.

4.3    Preservation Of Business And Relationships.  Each Seller will use its best efforts to preserve the Business intact and to preserve the present relationships of the Company with its customers, suppliers and employees.

4.4    Representations And Warranties At Closing.  Except as disclosed in the Disclosure Schedule at or prior to the Closing, all representations and warranties of Sellers set forth in this Agreement and any written statements delivered to Buyer under this Agreement will be true and correct as of the Closing Date as if made on that date.

4.5    Exclusive Dealings.  Sellers and the Company agree that prior to the Closing Date it shall not enter into or conduct any discussions, directly or indirectly, with any other prospective purchaser, suitor or other entity interested in acquiring, merging with, consolidating or conducting any other type of business combination with Sellers or the Company or its assets, without the prior written consent of Buyer.

4.6    Prompt Action.  Sellers and the Company agree that each will promptly take all action necessary to complete the transactions contemplated by this Agreement.

4.7    Confidentiality.    Sellers and the Company will treat this Agreement, and the transactions contemplated hereby, as confidential, and will not issue any press release or otherwise provide any information to persons, other than its representatives and agents working on such transaction, regarding such transactions without the prior written consent of Buyer.

14

*Execution Copy*

4.8    <u>Corporate Matters</u>.  Except as specifically contemplated by this Agreement, Sellers and the Company shall not (i) amend its Articles of Incorporation to Bylaws, (ii) issue any shares of its capital stock, (iii) issue or create any warrants, obligations, subscriptions, options, convertible securities or other commitments under which any additional shares of its capital stock of any class might be directly or indirectly authorized, issued or transferred from treasury, or (iv) agree to do any of the acts listed above.

## ARTICLE V
## BUYER'S OBLIGATIONS BEFORE CLOSING

5.1    <u>Cooperation in Securing Consents of Third Parties</u>.  Buyer will use its reasonable best efforts to assist the Company in obtaining the consent of any necessary third persons or agencies to the transaction contemplated hereby.

5.2    <u>Representations and Warranties at Closing</u>.  All representations and warranties of Buyer set forth in this Agreement and any written statements delivered to Sellers or Company under this Agreement will be true and correct as of the Closing Date as if made on that date.

5.3    <u>Prompt Action</u>.  Buyer agrees that it will promptly take all action necessary to complete the transactions contemplated by this Agreement.

5.4    <u>Confidentiality</u>.  Until the Closing Date, Buyer will treat this Agreement, and the transactions contemplated hereby, as confidential, and will not issue any press release or otherwise provide any information to persons, other than its representatives and agents working on such transaction, regarding such transactions without the prior written consent of Sellers.

## ARTICLE VI
## CLOSING CONDITIONS OF BUYER

Buyer's obligations to purchase the Stock are subject to the fulfillment or written satisfaction, or waiver by, the Buyer, on or prior to the Closing Date of all of the conditions set forth in this Section VI.  Each Seller acknowledges and agrees that Buyer shall not owe Sellers or the Company any amount for a failure of the Closing to occur as a result of a closing condition.

6.1    <u>Representations and Warranties True</u>.  All representations and warranties made by Sellers contained in this Agreement, the Disclosure Schedule, or in any written statement, are true and correct as if made on the Closing Date.

6.2    <u>Satisfactory Due Diligence</u>. Buyer shall be satisfied in its sole discretion (i) that any matters included in the Disclosure Schedule which Buyer deems to

*Execution Copy*

be unacceptable and which have been specified in writing to Sellers have been remedied to Buyer's satisfaction, and (ii) with the results of its business, technical, legal and financial review of the books, records, agreements and other legal documents and business organization of the Company.

6.3     Consents, Approvals and Waivers.  Sellers, Buyer and Company shall have obtained, in a manner satisfactory to Buyer and its counsel, any and all approvals, consents, permits and waivers and made all filings necessary or appropriate for the sale and transfer of the Stock pursuant to this Agreement and to complete the related transactions as contemplated herein.

6.4     Covenants.  All covenants, agreements and conditions contained in this Agreement to be performed by the Parties on or prior to the Closing Date shall have been performed or complied with in all respects.

6.5     Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions shall be satisfactory in substance and form to Buyer and its counsel, and Buyer and its counsel shall have received all such counterpart originals or certified or other copies of such documents and instruments as they may reasonably request.

6.6     No Adverse Change.  During the period from the date hereof until the Closing Date, there shall have been no material adverse change in the financial condition or business of the Company.

6.7     Absence of Litigation.  No action, suit or proceeding before any court or government body, pertaining to the transaction contemplated by this Agreement or the Company, shall have been instituted or threatened on or before the Closing Date.

6.8     No Change In Status or Condition Of Assets.  There shall have been no material change in the condition of any of the assets, whether tangible or intangible, of the Company and no proceeding with respect to any of the assets.

6.9     Employment Agreement.  Dean Angelle will have entered into an employment agreement with the Division, substantially in the form attached as Exhibit E hereto.

6.10    Employee Confidentiality Agreements.  All key personnel of the Company shall enter into non-compete and confidentiality agreements with the Division, in the form or forms as the Buyer may reasonably request.

6.11    Lease Agreement.   Sellers shall have entered into a Lease Agreement with Sellers' company, Angelle Properties, L.L.C., to lease the property located at 2450 S.E. Evangeline Throughway, Lafayette, Louisiana (the "*Property*") substantially in the form attached as Exhibit G.

ARTICLE VII
CONDITIONS PRECEDENT TO SELLERS' PERFORMANCE

The obligations of the Sellers to consummate their obligations under this Agreement are subject to the satisfaction, on or before the Closing Date, of all of the following conditions:

7.1    Accuracy of Buyer's Representations And Warranties.    All representations and warranties of Buyer contained within this Agreement or in any written statement delivered by Buyer under this Agreement shall be true on and as of the Closing Date as though such representations and warranties were made on such date.

7.2    Buyer's Performance.  Buyer shall have performed and complied with all of the covenants and agreements and satisfied all conditions that it is required by this Agreement to perform, comply with or satisfy before the Closing Date.

7.3    Employment Agreement.  The Division will have entered into an employment agreement with Dean Angelle, substantially in the form attached as Exhibit E hereto.

7.4    Lease Agreement.  The Division shall have entered into a Lease Agreement with Sellers' company, Angelle Properties, L.L.C., substantially in the form attached as Exhibit G.

ARTICLE VIII
ADDITIONAL AGREEMENTS

8.1    Confidentiality.  For a period of five (5) years from the date of this Agreement, the Sellers shall hold in confidence and use their reasonably best efforts to have all of their respective employees, agents, representatives and affiliated companies hold in confidence all documents and other written material containing information of a confidential nature belonging to the other Party (including, but not limited to, the intellectual property rights), and, except as contemplated by this Agreement, shall not disclose, publish, use or permit others to use the same; provided, however, that the foregoing restriction shall not apply to any portion of the foregoing which: (i) becomes generally available to the public in any manner or form through no fault of either Party, or their respective employees, agents or representatives; (ii) is released for disclosure by one Party with the other Party's consent, or (iii) when such disclosure is required by a court or a governmental agency or is otherwise required by law or is necessary in order to establish rights under this Agreement or any other agreements referred to herein.

8.2    Payment of Expenses.  Whether or not the transactions contemplated by this Agreement are consummated and, except as otherwise may be expressly provided

17

herein, each Party shall pay its own fees, expenses and disbursements and those of its respective agents, representatives, consultants, accountants and counsel incurred in connection with this Agreement and all other costs and expenses incurred in the performance and compliance with all conditions to be performed by such Party under this Agreement. It is understood and agreed to by the Parties that Sellers will cause the Company to pay the expenses that are directly related to the transactions contemplated by this Agreement on or prior to the Closing Date.

        8.3      <u>Information Relating To Taxes</u>. Sellers shall furnish to Buyer and the Division from time to time after the Closing Date any information reasonably requested by Buyer or the Division which is in the possession of or reasonably available to Sellers to permit Buyer or the Division: (i) to file on a timely basis its federal income tax returns and its estimated federal income tax returns and any other Tax returns which may be required by any federal, state, local or foreign tax authority, and (ii) to comply with orders issued by any federal, state, local or foreign governmental authority.

        8.4      <u>Further Assurances</u>. Sellers, at any time after the Closing Date, at the request of Buyer, or the Division, shall execute, acknowledge and deliver any further assignments, conveyances and other assurances, documents and instruments of transfer, and will take any other action consistent with the terms of this Agreement, that may reasonably be necessary for the purpose of assigning, granting and confirming to Buyer all Stock and assets to be conveyed pursuant to this Agreement. Sellers shall not voluntarily undertake any course of action which materially interferes in any way with the rights obtained by Buyer hereunder or is otherwise inconsistent with the satisfaction of its obligations or agreements set forth in this Agreement.

        8.5      <u>No Merger, Non-Compete</u>. For five (5) years after the Closing Date, (i) if Buyer acquires another entity to be added to the Division, then Sellers shall have the right to maintain the Division's accounting and books and records separate from the new entity's accounting, books and records for purposes of the calculation of the Annual Earn-Out Payment, End of Term Earn-Out Payment, and Flip Fee, and (ii) Buyer, and its Affiliates shall not engage in a business that competes with the Business; <u>provided that</u>, if the Employment Agreement is terminated for any reason other than for Company Cause or Company Voluntary Termination (as such terms are defined in the Employment Agreement), this Section 8.5 shall become null and void and have no effect as of the termination date of the Employment Agreement. "*Affiliate*" as used in this Agreement means, with respect to either Party, any individual or entity that directly or indirectly controls, is controlled by or is under common control with that Party. As used in this definition, "control" means either (i) the ownership of greater than 50% of an entity's voting securities, or (ii) the ability, through contract or otherwise, to determine an entity's operating activities.

        8.6      <u>Access to Buyer's Records</u>. After the Closing, Sellers, their counsel, their accountants and other representatives shall have reasonable access during normal business hours to Buyer's and the Division's properties, accounts, records, contracts and documents as may be necessary to determine the Annual Earn-Out Payment, End of Term

Earn-Out Payment, and Flip Fee. Buyer shall furnish or cause to be furnished to Sellers and their representatives' data and information concerning the Business, finances and properties of the Division and Buyer as Sellers shall reasonably require and request.

     8.7     <u>Indebtedness</u>.

     (a)     Within thirty (30) days after the Closing Date, the Division shall cause to have that certain One Million Five Hundred Thousand Dollar ($1,500,000) Whitney National Bank Business Line of Credit satisfied in full. If the Division shall fail to satisfy such debt, the Division shall, in accordance with Article IX herein, indemnify and hold Sellers harmless from any liabilities directly stemming from such failure that occurs after the Closing Date. Any claims pursuant to this Section 8.6 shall not count against the Basket (as defined herein).

     (b)     On the Closing Date, the Division shall assume the Company Vehicles and the Vehicle Loans.

     8.8     <u>Environmental Inspection and Testing</u>. Buyer shall, at their sole cost and expense, conduct a Phase II environmental assessment of the Property which will include, but not be limited to certain of the soils, including invasive boring and testing, of the Property. If the Phase II environmental assessment of the Property recommends environmental remediation measures with respect to the Property or other equipment and facilities affecting the Property (the *"Environmental Remediation"*), Sellers shall promptly conduct the Environmental Remediation at their sole cost and expense, and such Environmental Remediation shall be promptly performed with minimal interruption to the Division's business activities at the Property. The Environmental Remediation shall be deemed complete upon the preparation and delivery to Buyer of a report by a licensed environmental engineer reasonably satisfactory to Buyer that the Property (i) is free of any hazardous materials or hazardous substances (as such terms are defined by Environmental Laws), (ii) is in a condition that meets all requirements of law, including but not limited to the State of Louisiana Department of Environmental Quality Consolidated Compliance Order & Notice of Potential Penalty dated as of February 19, 2004, and (iii) that any leakage from any equipment or facilities affecting the tested soils has been appropriately remediated (the *"Remediation Report"*). The date the Remediation Report is deemed complete shall be the *"Remediation Report Date"*. If the Sellers fail to satisfy their obligations under this Section 8.8, Sellers shall, in accordance with Article IX herein, indemnify and hold Buyer's Indemnified Parties harmless from any liabilities directly stemming from such failure.

ARTICLE IX

INDEMNIFICATION

     9.1     <u>Indemnification By Sellers</u>.

     (a)     Sellers, jointly and severally, agree to indemnify and hold Buyer, the Division, and each of their employees, officers, directors, shareholders, subsidiaries, members, employees and agents and the successors, heirs and personal representatives of

any of them (collectively the "*Buyer Indemnified Parties*"), harmless from and against any damages, liabilities, losses and expenses (including, but not limited to, reasonable expenses of investigation and reasonable attorneys' fees incurred in defending any claim, including claims by any third party, amounts paid in settlement of any claim or suit, including, Taxes, fines, penalties and interest) whether absolute, accrued or contingent, known or unknown, and whether or not disclosed by Sellers in this Agreement (including the Disclosure Schedule or most recent financial statements) (collectively, "*Loss*" or "*Losses*") which may be sustained or suffered by the Buyer Indemnified Parties, caused by, arising out of, or relating to:

(i)     a breach of any representation or warranty made by Sellers in Article 2 herein;

(ii)    a failure to perform any covenant made by Sellers in this Agreement;

(iii)   any product warranty or product liability claims with respect to products, materials or services produced, invoiced, sold, performed or shipped by the Company on or prior to the Closing Date;

(iv)    any employee related matters with respect to any person employed by the Company on or prior to the Closing Date;

(v)     any act, omission to act or occurrence (but excluding such acts, omissions to act, and occurrences that are in the ordinary course of business (including, but not limited to, accounts payable in the ordinary course of business), pertaining in any way to the Company on or prior to the Closing Date;

(vi)    any negligent act of or breach by the Company (or any of its affiliates or predecessors or any of the respective officers, directors, agents, consultants or employees of Sellers or any of their affiliates or predecessors) with respect to the performance by such parties of services, contracts, agreements, policies or similar undertakings on or prior to the Closing Date (collectively, Section 9.1(a)(i) through (vi), "*Buyer's General Liability Claims*");

(vii)   any Taxes pertaining to the conduct or operation of the Company on or prior to the Closing Date, including, without limitation, the transactions contemplated by this Agreement or any of the Transaction Agreements ("*Tax Claims*"); and

(viii)  any Environmental Laws, including, without limitation, any release or threatened release of hazardous substances or hazardous materials (as such terms are defined in any Environmental Laws) occurring on or prior to before the Remediation Report Date ("*Environmental Claims*");

*Execution Copy*

provided, however, that (A) no indemnification shall be payable by the Sellers with respect to any claims asserted by the Buyer Indemnified Parties after the expiration or termination date prescribed for such claims in Section 9.5 hereof, and (B) the liability of the Sellers for indemnification payable under this Section 9.1(a) shall not exceed (1) for all Tax Claims, fifty percent (50%) of the Total Consideration, (2) for all Environmental Claims, fifty percent (50%) of the Total Consideration; and (3) for all Buyer's General Liability Claims, (i) for the period commencing on the Closing Date through and including the second anniversary of the Closing Date, fifty percent (50%) of the Total Consideration, (ii) after the second (2nd) anniversary of the Closing Date through and including the third (3rd) anniversary of the Closing Date, twenty percent (20%) of the Total Consideration, and (ii) after the third (3rd) anniversary of the Closing Date through and including the fifth (5th) anniversary of the Closing Date, ten percent (10%) of the Total Consideration.

(b)     For purposes of this Agreement, *"Taxes"* means federal, state, local or foreign taxes, assessments, interest, penalties, deficiencies, fees and other governmental charges or impositions (including without limitation, all income tax, unemployment compensation, social security, payroll, sales and use, excise, privilege, property, ad valorem, franchise, license, school and any other tax or similar governmental charge or imposition).

9.2     Indemnification By The Division. The Division agrees to indemnify and hold the Sellers, the Company and its employees, officers, directors, shareholders, members, employees and agents and the successors, heirs and personal representatives of any of them (collectively, the *"Sellers' Indemnified Parties"*), harmless from and against any damages, liabilities, losses and expenses (including, but not limited to, reasonable expenses of investigation reasonable attorney's fees and reasonable expenses of investigation incurred in defending any claim, including claims by a third person, amounts paid in settlement of any claim, or suit, Taxes, fines, penalties and interest) whether absolute, accrued or contingent, known or unknown, and whether or not disclosed by Sellers in this Agreement or on the Disclosure Schedule or most recent financial statements (collectively, *"Loss"* or *"Losses"*) which may be sustained or suffered by Sellers' Indemnified Parties, caused by, arising out of, or relating to:

(i)     a breach of any representation or warranty made by Buyer in Article 3 hereof;

(ii)    a failure to perform any covenant made by Buyer in this Agreement;

(iii)   any product warranty or product liability claims with respect to products, materials or services produced, invoiced, sold, performed or shipped by the Division after the Closing Date;

(iv)    any employee related matters with respect to any person employed by the Division after the Closing Date;

(v)     any act, omission to act or occurrence pertaining in any way to the Division after the Closing Date;

(vi)     any negligent act of or breach by the Division (or any of its affiliates or any of the respective officers, directors, agents, consultants or employees of the Division) with respect to the performance by such parties of services, contracts, agreements, policies or similar undertakings after the Closing Date;

(vii)     any Taxes pertaining to the conduct or operation of the Division after the Closing Date, including, without limitation the transactions contemplated by this Agreement or any of the Transaction Agreements; and

(viii)     any Environmental Laws, including, without limitation, any release or threatened release of hazardous substances or hazardous materials (each as defined by any Environmental Law) occurring after the Remediation Report Date.

provided, however, that (A) no indemnification shall be payable by the Division with respect to any claims asserted by the Sellers' Indemnified Parties after the expiration or termination date prescribed for such claims in Section 9.5 hereof, and (B) the aggregate liability of the Division for indemnification payable for any and all Losses under this Section 9.2 shall not exceed fifty percent (50%) of the Total Consideration.

9.3     Notice and Defence of Claims.

(a)     In the event that any of the parties shall incur or suffer any Losses in respect of which indemnification may be sought by such Party pursuant to the provisions of this Section 9, the Party seeking to be indemnified hereunder (the "*Indemnified Party*") shall assert a claim for indemnification by written notice (a "*Notice*") to the Party from whom indemnification is sought (the "*Indemnifying Party*") stating the nature and basis of such claim. In the case of Losses arising by reason of any third party claim, the Notice shall be given within thirty (30) days of the filing or other assertion of any such claim against the Indemnified Party, but the failure of the Indemnified Party to give the Notice within such time period shall not relieve the Indemnifying Party of any liability that the Indemnifying Party may have to the Indemnified Party unless the Indemnifying Party is actually prejudiced thereby.

(b)     The Indemnified Party shall provide to the Indemnifying Party on request all information and documentation reasonably necessary to support and verify any Losses which the Indemnified Party believes give rise to a claim for indemnification hereunder and shall give the Indemnifying Party reasonable access to all premises, books, records and personnel in the possession or under the control of the Indemnified Party which would have bearing on such claim.

9.4     Exclusive Remedy. Except in the case of fraud or as otherwise provided in this Agreement or any of the Transaction Agreements, the sole recourse and

*Execution Copy*

exclusive remedy of the Buyer, the Division, and Sellers against each other for claims arising out of this Agreement, whether based on tort, contract, statutory or common law remedy or equitable remedy or otherwise, including but not limited to, any misrepresentation, breach of warranty or otherwise, shall be to assert a claim for indemnification under the indemnification provisions of this Article IX, and the Buyer , the Division, and the Seller covenant that it or they will not seek to obtain any remedy except as provided in this Article IX.

9.5     Survival.

(a)     All representations and warranties made by a Party shall survive through and including the fifth (5th) anniversary of the Closing Date, except that representations and warranties made relating to tax issues shall survive through and including the seventh (7th) anniversary of the Closing Date.

(b)     Each Party's right to assert a claim for indemnification under this Article IX shall survive through and including the fifth (5th) anniversary of the Closing Date, except that each Party's right to make an indemnification claim based on tax issues shall survive through and including the seventh (7th) anniversary of the Closing Date.

(c)     Notwithstanding anything to the contrary contained in this Agreement, if an Indemnified Party shall have delivered a Notice to the Indemnifying Party of one of more claims for indemnification pursuant to this Article 9 in accordance with Section 9.3, the limitations set forth in this Section 9.5 shall not apply to such claims until such claims, and the losses with respect thereto, are finally resolved or settled or a final arbitral award (or other judgment, if applicable) has been issued by an arbitral tribunal (or other tribunal with competent jurisdiction) with respect to such claims.

9.6     Limitations on Indemnification.  For purposes of this Article IX, in calculating the dollar amount limitations on indemnification, Total Consideration shall include all amounts earned during the Term of this Agreement without regard to the date such amounts are earned.  When contingent future earnings are earned, such amounts earned shall be included in the calculation of the indemnification limitation (which are based on a percentage of Total Consideration) and will retroactively apply in the calculation of Total Consideration to reimburse a Party for any indemnification claims made in a timely manner pursuant to this Article IX.


ARTICLE X
MISCELLANEOUS

10.1     Entire Agreement.  This Agreement, including the schedules and exhibits hereto, and the Transaction Agreements, contains the entire understanding among the parties hereto and with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, representations, inducements or conditions, express or implied, oral or written, except as set forth herein.  The express

terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

       10.2   <u>Amendment and Waiver</u>. This Agreement may not be modified, amended or supplemented other than by an agreement in writing executed by all parties hereto. No waiver shall be binding unless executed in writing by the Party making the waiver. No waiver of any provisions, breach or default of this Agreement shall be deemed or shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.

       10.3   <u>Delays or Omissions</u>. It is agreed that no delay or omission to exercise any right, power or remedy accruing to any Party, upon any breach, default or noncompliance by another Party under this Agreement, shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence therein, or of or in any similar breach, default or noncompliance thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character of any breach, default or noncompliance under this Agreement or any waiver of any provisions or conditions of the Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or otherwise afforded to any Party, shall be cumulative and not alternative.

       10.4   <u>Assignment</u>. Neither Party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other Party hereto (which consent shall not be unreasonably withheld). This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

       10.5   <u>Notices</u>. All notices, requests, demands and other communications required or permitted under this Agreement and the transactions contemplated herein shall be in writing and shall be deemed to have been duly given, made and received on the date when delivered by hand delivery with receipt acknowledged, or upon the next business day following receipt of telex or telecopy transmission, or upon the third day after deposit in the United States mail, registered or certified with postage prepaid, return receipt requested, addressed as set forth below:

            (a)         <u>If to Buyer</u>:

                       Argo Turboserve Corporation
                       49 Commerce Road
                       Carlstadt, New Jersey
                       Attention: Clyde Keaton
                       Phone:
                       Fax:

            (b)         <u>If to Sellers</u>:

24

Dean and Denise Angelle
100 Blue Ridge Drive
Carencro, Louisiana 70520
Phone: 1-337-896-0413
Fax: 1-337-896-1930

with a copy to:

Perret Doise, APLC
600 Jefferson Street, Suite 1600
Lafayette, Louisiana 70501
Attn: Dennis Doise
Phone: 1-337-262-9000
Fax: 1-337-262-9001

Any Party may alter the addresses to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 10.5 for the giving of notice.

10.6    Incorporation of Schedules And Exhibits.  All schedules, exhibits and other documents and written information required to be delivered pursuant to this Agreement are incorporated into this Agreement by this reference and are warranted by the Party or Parties which deliver the same to be accurate and complete in all material respects.

10.7    Expenses.  Each Party will bear its respective expenses and legal fees incurred with respect to this Agreement, and the transactions contemplated hereby.

10.8    Captions.  The captions contained in this Agreement are for convenience and reference purposes only and shall not affect in any way the meaning and interpretation of this Agreement.

10.9    Severability.  If any provision of this Agreement, or the application thereof, will for any reason and to any extent be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the greatest extent possible, the economic, business and other purposes of the void or unenforceable provision.

10.10   Governing Law.  In all respects, including all matters of construction, validity and performance, this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York applicable

25

to contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws. Any action to enforce any of the provisions of this Agreement shall be brought in a court of the State of New York located in the Borough of Manhattan of the City of New York, or in a Federal court located within the Southern District of New York. The parties consent to the jurisdiction of such courts and to the service of process in any manner provided by New York law. Each Party irrevocably waives any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such court and any claim that such suit, action or proceeding brought in such court has been brought in an inconvenient forum and agrees that service of process in accordance with the foregoing sentences shall be deemed in every respect effective and valid personal service of process upon such Party.

10.11  Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof shall bear the signatures of all of the Parties indicated as the signatories hereto.

10.12  Attorneys' Fees. In the event that any action or proceeding is brought by any Party to enforce or interpret any provision, covenant or condition contained in this Agreement, the prevailing party in such action or proceeding (whether after trial or appeal) shall be entitled to recover from the Party not prevailing its expenses therein, including reasonable attorneys' fees and allowable costs.

10.13  Representation. This document is the result of negotiations between Parties, each of whom was represented or had the opportunity to be represented in the transaction, and has had the opportunity to have had the transactional documents reviewed by counsel of their own choice.

10.14  Right of Offset. Buyer and the Division shall have the right to offset any amounts payable under any Transaction Agreement, by any monies owed to Buyer or the Division by the Sellers. This right shall survive the expiration and termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**BUYER**
ARGO TURBOSERVE CORPORATION

By: _____
Name:    Clyde Keaton
Title:    President

**SELLERS**

By: _____
Name:    Dean Angelle

By: _____
Name:    Denise Angelle

**COMPANY**

D & D PIPE AND RENTALS, INC.

By: _____
Name:    Dean Angelle
Title:    President

STOCK PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**BUYER**
ARGO TURBOSERVE CORPORATION

By: _____
Name:    Clyde Keaton
Title:     President

**SELLERS**

By: _____
Name:    Dean Angelle

By: _____
Name:    Denise Angelle

**COMPANY**

D & D PIPE AND RENTALS, INC.

By: _____
Name:    Dean Angelle
Title:     President

**STOCK PURCHASE AGREEMENT**

**Exhibit D**
**Disclosure Schedule**

Schedule 2.1    The Company is qualified to do business in the State of Texas where it reports sales and franchise taxes.
The Company reports sales taxes in the State of Mississippi, but has not qualified to do business there.

Schedule 2.2    The Company has the following undisclosed liabilities:
The Company is currently undergoing an Auto Liability Insurance Audit, #DS 0000028236 for the time period of June 13, 2004 to June 13, 2005.

Schedule 2.3    The Company has, and or will prior to Closing, pay off the loan to shareholders. To the extent that the shareholder loan is not fully paid prior to Closing, it will be documented with a promissory note, and interest accrued on the loan after the Closing Date shall not be included as a deduction from the Annual Earn-Out, End of Term Earn-Out, or Flip Fee.

Schedule 2.5    The following property of the Company is held under certain leases:

Forklifts

_____

Schedule 2.6    The schedule of Accounts Receivables is attached as Exhibit D-1. The following accounts receivable are either uncollectible or subject to dispute:

_____

Schedule 2.7    The only intellectual property the Company owns is its logo, a copy of which is attached as Exhibit D-2, and website (_____). The Company has no other Trade Names, Trademarks, Copyrights, or Patents.

Schedule 2.8    The Company has the following bank notes (copies of some of these documents are attached as Exhibit D-3) which encumber the respective property below:

Whitney National Bank
-    2004 Chevrolet Suburban, VIN 1GNEC16Z44J172593, Loan #00324
-    2000 Ford F350, VIN 1FTWW33F6YED19537, Loan #010004000005/00083695
GMAC
-    2006 Chevrolet Tahoe, VIN 1GNEC132X6R169211, Loan #024-9083-53261

- 2006 1500 Crew Cab, VIN 2GCEK13T561231002, Loan #024-9085-55891
- 2002 GMC Pick-Up Truck, VIN 2GTFK69U821343143, Loan #

The Company's line of credit with Whitney National Bank is secured by liens against all the Company's accounts receivable, inventory, and Equipment\

Schedule 2.9   See customer list attached as <u>Exhibit D-4</u>.
Aspen Exploration, one of the Company's customers, filed for Chapter 7 Bankruptcy protection.

Schedule 2.10  The Company is currently under a DEQ remediation order and copies of the relevant documents are attached as <u>Exhibit D-5</u>.
Also, the Company has been made a party to that certain lawsuit entitled *Rathborne Properties, L.L.C., et. al. vs. Exxon Mobil Corporation, et. al.,* CDC No. 2001-12081 Division "N," Section 8.

Schedule 2.11  The Company is party to the following lawsuits and/or claims:

Worker's Compensation claim filed by Alvin Gilbert.

*Atlas Tubular, L.P. v. Flash Gas & Oil Southwest, Inc.,* Docket # 2003-10266-A, 22nd Judicial District Court, Parish of St. Tammany, State of Louisiana.

*Rathborne Properties, L.L.C., et. al. vs. Exxon Mobil Corporation, et. al.,* CDC No. 2001-12081 Division "N," Section 8

*Joe Livings, Jr. v. D & D Pipe Rentals, Inc.,* Docket 2003-09005, District of Louisiana, Office of Workers' Compensation.

Resolved Matters:

*D & D Pipe & Rentals, Inc. v. Aspen Exploration, Inc.,* Docket # 04-CV-1279, Federal Court, Western District of Louisiana.

*D & D Pipe & Rentals, Inc. v. Aspen Exploration, Inc.,* Docket # 04-CV-976, Federal Court, Western District of Louisiana.

*D & D Pipe and Rentals, Inc v. Umma Resources, Inc.,* Docket # 03-CV-273, Federal Court, Western District of Louisiana.

*Umma Resources, Inc. v. D & D Pipe & Rentals, Inc.,* Docket # 03-CV-181, Federal Court, Western District of Louisiana.

*Franks International, Inc. v. D & D Pipe & Rentals, Inc.*, Docket # 00-CV-1993, Federal Court, Western District of Louisiana.

*Transtrade International Comercio Importacao Exportacao, Ltda. V. D & D Pipe & Rentals, Inc.*, Docket # 98-CV-1070, Federal Court, Western District of Louisiana.

*Arthur Felscher v. Dean Michael Angelle, et al*, Docket # 2003-2477, 15th Judicial District Court, Parish of Lafayette, Louisiana, State of Louisiana.

*Goldin Associates, LLC v. D &D Pipe & Rentals, Inc.*, Docket # 98-5079, Federal Court.

*Umma Resources, Inc. v. D & D Pipe & Rentals, Inc.*, Docket # 03-CV-33, Federal Court, Southern District of Texas.

*Dean Angelle v. Hanover Insurance Company and Safeway Insurance Company*, Docket # 1993-4863, 15th Judicial District Court, Parish of Lafayette, State of Louisiana.

*Mohammad Ladjevardian v. Dean Angelle and D & D Pipe and Rentals, Inc.*, Docket # 2003367182, Harris County, District Court, State of Texas.

Schedule 2.13 The Company has contracts with the following parties:

Ken Burton (deer lease)
Verandas at Old Farm (Houston apt.)
Angelle Properties, L.L.C. (D&D property)
Acadiana Bottling Srvc.
Bellsouth (telephone)
Grass Roots (lawn maintenance)
Kentwood Springs (water)
Verizon Wireless (cell phone)
Waste Management (trash collection)
John Deer (forklift lease)
Aflac (insurance)
Cintas (rugs)
AICCO (auto, GL Financing)

**Hunting Camp**
Big Bend Telephone
MCI Long distance
Dish network

Rio Grande electric coop
Sanderson wool commission
Eddins-Walcher

**Houston Apartment**
Southwestern Bell
Reliant energy communication
Time Warner cable
Verandas de Old farm water & sewage
Julie's cleaning service

**D & D Pipe & Rentals**
A-1 professional service (answering service)
American express business card
AT&T calling card
Joe Anderson reports
Ardoin's exterminating
Atmos service (gas)
Cintas first aid & safety
Chevron gas card
Federal express
Fleetcor technologies (fuelman gas cards)
Hibernia MasterCard business card
Judice well service (water well maintenance)
LUS
Petroleum club of Lafayette
Pitney bowes (Stamp machine)
Romero & McGee (CPA)
Thelma Sargent (Office cleaning)
Slemco
Texaco Fleet Card
U.S. postal service (Annual Rental of PO Box)

Copies of certain of these contract documents are attached as <u>Exhibit D-6</u>.

Schedule 2.14 The Employee List is attached as <u>Exhibit D-7</u>.

Schedule 2.15 The Company is currently under a DEQ remediation order for which
copies of the relevant documents are attached as <u>Exhibit D-5</u>. Costs
associated with the subject remediation were accrued on the Company's
year-end financials.

Also, the Company has been made a party to that certain lawsuit entitled
***Rathborne Properties, L.L.C., et. al. vs. Exxon Mobil Corporation, et.
al.***, CDC No. 2001-12081 Division "N," Section 8.

Schedule 2.17 This transaction may constitute a default under the Whitney loan documents.

Schedule 2.21 The Company leases the property it operates its business on from Angelle Properties, L.L.C.

Schedule 2.22 The Company has the following bank notes, copies of some of which are attached as Exhibit D-3.

> Whitney National Bank Line of Credit #03674001
> - Loan, 2004 Chevrolet Suburban, VIN 1GNEC16Z44J172593, Loan #00324
> - Loan, 2000 Ford F350, VIN 1FTWW33F6YED19537, Loan #010004000005/00083695
> -
> GMAC
> - 2006 Chevrolet Tahoe, VIN 1GNEC132X6R169211, Loan #024-9083-53261
> - 2006 1500 Crew Cab, VIN 2GCEK13T561231002, Loan #024-9085-55891
> - 2002 GMC Pick-Up Truck, VIN 2GTFK69U821343143, Loan #

> The Company has the following bank accounts with Whitney National Bank:
> - Operating Account #713820438
> - Payroll Account #713819987

> The Company's accounting firm has a signature stamp used to sign Company checks in the absence of the Sellers.

Schedule 4.2   See Exhibit D-7.

Other Disclosures:

- There are 3 bill boards on the property which generate revenue that may have at some point been paid to the Company, however, these Lease Agreements are not being transferred in this Agreement as some are assets of the Sellers or one of their other Companies.

- Dean has an ownership interest in the following companies which the Company does business with.

> 1.   Cypress Tree
> NEED ADDRESS INFOR

2.     MSF
       603 Myra Street
       New Iberia LA  70563-1923
       Attn: Bob Wapnarski

3.     Mid-Southern Pipe & Supply, Inc.
       P.O. Box 81381
       Lafayette LA  70598
       Attn: Hugh Brasier

4.     _____