

# JONES WALKER

Carl D. Rosenblum
*Admitted in Louisiana and Texas*
Direct Dial 504-582-8296
Direct Fax 504-589-8296
crosenblum@joneswalker.com

October 24, 2007

*VIA FACSIMILE: 212-371-0320*
*AND EMAIL*

Steven J. Cohen, Esq.
Wachtel & Masyr, LLP
110 East 59th Street
New York, NY 10022

    Re:    **Dean and Denise Angelle / D&D Pipe and Rentals, Inc. /
Argo Turboserve Corporation
Our File No. 111669-00**

Dear Mr. Cohen:

    I acknowledge receipt of your letter dated October 23, 2007. Although I certainly do not want to engage in a paper war, I take this opportunity to respond in an effort to "clear the air." Again, the reports that you have received from your clients' employee(s) about the visit to D&D's Lafayette offices on Monday, October 15, are simply in error.

    As you know, by letter dated August 14, 2007, you forwarded my clients, Dean and Denise Angelle ("Angelle") a "Notice of Indemnification" pursuant to § 9.3 of the Stock Purchase Agreement. In response, you received Ms. Swords' letter dated September 5, 2007, requesting information (documentation or evidence) to support the allegations set forth in your "Notice of Indemnification." The Stock Purchase Agreement states that such "shall" be provided. Having received no response, I forwarded you my letter dated September 12, 2007, specifically referencing § 9.3(b) of the Stock Purchase Agreement requesting that we immediately be given "reasonable access to all premises, books, records and personnel in the possession or under the control" of you and your client. You responded by letter dated September 21, 2007, to which I responded by letter dated September 26, 2007, again reiterating that "the access contemplated by § 9.3(b) of the Stock Purchase Agreement at D&D's offices in Lafayette, Louisiana" was what was being scheduled. By letter dated October 2, 2007, you advised that the "inspection" at D&D's offices in Lafayette could take place on October 15, 2007. I confirmed the October 15, 2007 Lafayette inspection to you by email dated October 4, 2007.

**EXHIBIT 13**
JONES, WALKER, WAECHTER, POITEVENT, CARRÈRE & DENÈGRE L.L.P.

201 ST. CHARLES AVENUE   NEW ORLEANS, LOUISIANA 70170-5100   504-582-8000   FAX 504-582-8583   E-MAIL info@joneswalker.com   www.joneswalker.com
{N1725665.1}
BATON ROUGE   HOUSTON   LAFAYETTE   MIAMI   NEW ORLEANS   WASHINGTON, D.C.

October 24, 2007
Page 2

At no time during any correspondence from me or during our conversation on Friday, October 12, 2007, did you advise that my clients would not be provided with the "access" contemplated by § 9.3(b) of the Stock Purchase Agreement. You did tell me who I should ask for when we arrived at D&D's Lafayette offices, but at no time did you indicate that I was not able to fully perform the contemplated "access." You also did advise me that books and records were in the process of being shipped from D&D's Lafayette, Louisiana, offices to ATC's offices in New Jersey, and that consequently any documentation that I wished to have a copy of, I should tag and that you would see to it that I would get such a copy.

Perhaps we had a misunderstanding, but you can clearly see that there is absolutely nothing in writing suggesting that my clients didn't anticipate exercising their full rights under § 9.3(b) of the Stock Purchase Agreement. Nor did we discuss any such limitation. At most, we simply now disagree with what was contemplated when we visited D&D's Lafayette offices.

Putting aside whether the filing of the suit in New York is premature, certainly you can recognize that at the time my clients initially requested their § 9.3(b) rights, no lawsuit was pending, and simply by filing the lawsuit (at least without discussing the issue) should not impact my clients' rights to fully exercise the "access" specifically enumerated under § 9.3(b) of the Stock Purchase Agreement. Moreover, if I was really attempting to do something "underhanded" or improper, I would not have forwarded you my email on October 16, 2007, pointing out that "I was not permitted to speak with the few remaining D&D employees, other than Mr. Richard." There was no intent on my part to "abuse the arrangement" or "exploit the situation." I was simply attempting to exercise my understanding as to my clients' rights under § 9.3(b) of the Stock Purchase Agreement.

I am now clear that the access and inspection of the New Jersey location will be limited to review of documentation. We will make arrangements to visit ATC's New Jersey offices on the morning of November 19. I assume we can start at 9:00 a.m. Please recognize that since we, at least in our opinion, are not being permitted to exercise all of the Angelles' rights under § 9.3(b) of the Stock Purchase Agreement, that we are obviously reserving all of our rights in that regard.

Additionally, I take issue with whether my discussions with Mr. Richard were an "interview." I was simply asking him, as the designated host for our inspection, to direct me to "all information and documentation reasonably necessary to support and verify any Losses which the Indemnified Party believes gives right to a claim of indemnification" as set forth in § 9.3(b) of the Stock Purchase Agreement. I am not sure how I could have gone about doing this without bringing out your letter of August 14, 2007, and asking Mr. Richard to direct me to the information and documentation allegedly supporting the specific allegations.

As you know, when we arrived at the Lafayette office, Mr. Richard was not prepared to direct us to any specific documentation related to any of the allegations set forth in your letter, and consequently we went through the letter and he simply directed us to a number of boxes which, although already prepared for shipment up to New York, he voluntarily agreed to open. To suggest that we "rummaged through files and personal property" belonging to your client and

{N1725665.1}

"generally harassed and intimidated" your client's staff is simply not the case. Nor did we badger Mr. Richard. We were professional, courteous and cooperative. Indeed, when the issue of speaking with others arose, I immediately contacted your office to obtain clarification while we were all in Lafayette and respected your colleague's instructions because of your absence at trial.

I am also not sure which boxes you say we "elected not to review" and assume that those boxes, if they relate to the allegations set forth in your letter dated August 14, 2007, will be made available for our review in New Jersey.

Although I am now clear that our trip to New Jersey will only be to access documentation and to identify those documents to which we seek a copy, I expect, so that there is no misunderstanding, that whomever is the attorney from your office present during the inspection, that attorney will be able to direct us to the documents allegedly supporting the various allegations set forth in your letter dated August 14, 2007. Unlike what we encountered at D&D's Lafayette location, I therefore specifically request that you make arrangements to have an individual knowledgeable about the books and records that we will have access to and which of those books and records allegedly support the allegations set forth in your letter dated August 14, 2007.

As to the "attorney client privilege" document, I recall starting to look at one document and as soon as I recognized that it was arguably privileged, I brought it to Mr. Richard's attention and ceased reviewing it. We did not tag it for copying. Frankly, I don't even remember the subject matter of the letter since I only got so far as digesting who the document was from and to and don't even recall that information at the moment. No notes were taken about it. Additionally, if there are any documents that we did tag for copying that you believe are properly privileged, I have no objection to your suggestion that those documents were inadvertently made accessible to us.

I, too, sincerely hope that we can put this apparent misunderstanding behind us and, as I said to you during the first telephone conversation we had, although there are obviously serious disagreements between our respective clients, there is no reason that we, as attorneys, cannot conduct this matter professionally, civilly and with the utmost of courtesy. I certainly intend to do so.

                                      Very truly yours,

                                      Carl D. Rosenblum

CDR/pd

cc:    Gregory W. O'Neill, Esq.
       Eric M. Liddick, Esq.

{N1725665.1}